1           IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3    MICHAEL E. KELLY, et al.,            )

4              Plaintiffs,               ) Case No.

5         vs.                            ) 21-1949C

6    THE UNITED STATES OF AMERICA,        )

7              Defendant.                )

8

9

10                        Courtroom 6

11           Howard T. Markey National Courts Building

12                    717 Madison Place, N.W.

13                      Washington, D.C.

14                    Monday, March 11, 2024

15                        9:30 a.m.

16                      Oral Argument

17

18

19           BEFORE:  THE HONORABLE MOLLY R. SILFEN

20

21

22

23

24

25   Reported by:  Karen G. Willoughby, CER

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3            ALLAN B. DIAMOND, ESQ.
 4            ROBERT F. RUYAK, ESQ.
 5            DANA M. HOWARD, ESQ.
 6            GREG HERRMAN, ESQ.
 7            Diamond McCarthy LLP
 8            909 Fannin Street
 9            Suite 37th Floor
10            Houston, Texas 77010
11            (713) 333-5100
12            adiamond@diamondmccarthy.com
13    ON BEHALF OF THE DEFENDANT:
14            ANTHONY F. SCHIAVETTI, ESQ.
15            ELIZABETH HOSFORD, ESQ.
16            U.S. Department of Justice - Civil Division
17            P.O. Box 480
18            Ben Franklin Station
19            Washington, DC 20044
20            (202) 305-7572
21            anthony.f.schiavetti@usdoj.gov
22
23    ALSO PRESENT:
24        Jason Morrow, Department of Treasury
25        Asim Varma, Arnold & Porter, FHFA
```

```
 1              P R O C E E D I N G S
 2                  -   -   -   -   -
 3         (Proceedings called to order, at 9:35 a.m.)
 4         THE CLERK:  Please all rise.  The Honorable
 5    Molly R. Silfen now presiding.
 6         THE COURT:  You can be seated.  Thanks.  Good
 7    morning.
 8         COUNSEL:  Good morning.
 9         THE COURT:  So let's see, so we're here for
10    argument on the motion to dismiss in Kelly versus United
11    States, Number 21-1949.  And I thought we would -- I'm
12    not too worried about the sort of time, but I figured
13    just nominally like 30 minutes per side, the Government
14    going first, and you can reserve some time for rebuttal.
15         Is there anything we should discuss before we
16    get started?
17         MR. SCHIAVETTI:  No, Your Honor.
18         MR. DIAMOND:  No, Your Honor.
19         THE COURT:  Sounds good.  All right.  Then we
20    can hear from the Government.
21         MR. SCHIAVETTI:  Thank you, Your Honor.
22         Good morning, Your Honor, Anthony Schiavetti,
23    Department of Justice, for the United States  I'm joined
24    at counsel table by Elizabeth Hosford, Department of
25    Justice, as well as Jason Morrow, Department of the
```

1    Treasury.  Asim Varma, Arnold & Porter, is here, as well,

2    on behalf of the Federal Housing Finance Agency.

3          May it please the Court.  The Court should

4    dismiss Plaintiffs' amended complaint for six independent

5    reasons.  First, all of Plaintiffs' claims are barred by

6    this Court's jurisdictional statute of limitations.

7    Second, Plaintiffs' takings claims are precluded by the

8    Federal Circuit's dismissal of substantively identical

9    takings claims in Washington Federal.  Third, Washington

10   Federal clearly establishes that Plaintiffs fail to

11   allege a cognizable takings claim.

12         Fourth, the two takings claims that Plaintiffs

13   purport to bring directly are, in substance, derivative

14   claims and Plaintiffs lack standing to bring them

15   directly.  Fifth, Plaintiffs lack standing to assert a

16   derivative takings claim and, finally, Plaintiffs'

17   contract claims fail as a matter of law because

18   Plaintiffs fail to plausibly allege the existence of a

19   contract between themselves and the United States.

20         For these reasons, and those explained in our

21   briefing, we respectfully request that the Court dismiss

22   the amended complaint.

23         THE COURT:  Can I -- just a sort of overarching

24   question on those different grounds.

25         MR. SCHIAVETTI:  Yes, Your Honor.

1          THE COURT:  You said they're independent

2    grounds.  So does that mean that they each cover all of

3    the claims and that they each would be an independent

4    basis for dismissing?  I just wanted to make sure I

5    understand the sort of --

6          MR. SCHIAVETTI:  They are not dependent on each

7    other, so they don't need to overlap.  They each have at

8    least one independent basis for dismissing some of the

9    claims.  Some of the arguments, though, do apply to only

10   some of the claims.  So for example, the last is about

11   the contract claims only and some of the preclusion, for

12   example, is only about the takings claims, and that also

13   applies to the standing on the derivative claims, which

14   is -- of which there is only one pled directly and then

15   there are two that are substantively derivative.

16          So there are some that apply to only some

17   portion of the claims, but none of them depend on each

18   other, although certainly the preclusion and some of the

19   other binding aspects of Washington Federal apply to

20   several of the claims because of different aspects and

21   different legal effects of the same Federal Circuit

22   binding judgment that both precludes Plaintiffs' takings

23   claims here and also provides binding guidance to the

24   Court on exactly those substantively identical claims.

25          THE COURT:  On preclusion, just -- you call it

1    preclusion.  Is it claim preclusion, issue preclusion?

2    What precisely are we looking at?

3            MR. SCHIAVETTI:  It's both, Your Honor.

4    There's both claim and issue preclusion here.  And the

5    one piece there that may seem a bit odd, because we do

6    have certainly a different nominal plaintiff, but the --

7    because the claims are substantively derivative, they

8    belong to the enterprises and not to individual

9    shareholders.  So it doesn't matter whether it's these

10   shareholders or the shareholders in Washington Federal

11   asserting these claims, they are substantively

12   derivative, as the Court found, so they belong to the

13   enterprises.  So it's the same party, again, asserting

14   these same claims because it's the enterprises that are

15   the real party in interest here.

16           THE COURT:  And if the enterprises weren't the

17   real party in interest, do the preclusion principles

18   apply or is there a problem with them not being the same

19   party?

20           MR. SCHIAVETTI:  If it weren't that the

21   enterprises were the real party in interest, then, yes,

22   you have different shareholders.  So the preclusion may

23   not apply there, but you'd still have binding guidance on

24   exactly the same issue from the Federal Circuit because

25   the issues are substantively indistinguishable.

1          I can start, Your Honor, wherever you'd prefer,
2    but because the statute of limitations in this Court is
3    jurisdictional, it's really a threshold jurisdictional
4    issue that the Court has to resolve as to whether the
5    claims are timely under the Court's statute of
6    limitations in 28 U.S.C. Section 2501.  Plaintiffs
7    acknowledge, at least for the purposes of this motion,
8    that their claims accrued on September 6th, 2008, and
9    thus that their claims needed to be filed within six
10   years of that date, unless it was tolled.
11         Plaintiffs rely, however, on tolling based on
12   the purported class action in Washington Federal, even
13   though for other purposes, they call this a very
14   different case with very different claims.  Plaintiffs'
15   reliance on Washington Federal to toll the statute of
16   limitations is misplaced, however, for three principal
17   reasons.
18         First, class action tolling is equitable in
19   nature, as the Supreme Court has determined in its
20   decision in CALPERS and thus it's unavailable to toll
21   Section 2501, which is not susceptible to tolling that's
22   equitable in nature.
23         Second, class action tolling, in this Court,
24   requires the filing of a motion for class certification
25   prior to the expiration of the statute of limitations,

1   but the Washington Federal plaintiffs filed no such

2   motion in their case.

3           And, third, even if the Plaintiffs could rely

4   on Washington Federal to toll the statute of limitations

5   for their takings claims, Plaintiffs' contract claims

6   depend on factual allegations that are dissimilar to any

7   that were asserted by the Washington Federal plaintiffs

8   and those are, nevertheless, barred and cannot depend on

9   any class action tolling.

10          So for the first argument, equitable tolling,

11  including class action tolling, is not available to toll

12  Section 2501.  That's been clearly stated by the Supreme

13  Court in John R. Sand & Gravel and by the Federal Circuit

14  in Floor Pro vs. United States.  The Federal Circuit

15  first considered the question of the availability of

16  American Pipe class action tolling in Bright vs. United

17  States and it grappled with exactly this issue.  It knew

18  that class action tolling could not toll the Section 2501

19  statute of limitations if it were equitable in nature.

20  It engaged in an extensive analysis to determine whether

21  it were equitable in nature or statutory in nature.

22          There was also another issue there where the

23  Rule -- Rule of -- for the Court of Federal Claims 23, as

24  opposed to Federal Rule of Civil Procedure 23, which is

25  clearly statutory, there was some analysis as to whether,

1    because it has the force and effect of law, RCFC 23 was

2    also statutory.  The Court found it was, or ultimately

3    found that because it grounded -- it found class action

4    tolling under American Pipe to be statutory in nature,

5    then it was available to toll Section 2501.  That's what

6    the Federal Circuit held in Bright.

7           After that, years later, the Federal -- excuse

8    me, the Supreme Court, in CALPERS, California Public

9    Employees Retirement System, vs. ANZ Securities, looked

10   at exactly that same legal question.  It looked at what

11   is the nature of American Pipe tolling.  Is it statutory

12   or is it equitable in nature?  The Supreme Court

13   concluded looking at exactly that same question, that

14   American Pipe tolling is equitable in nature and, thus,

15   it was found that it was unable -- unavailable to toll

16   the statute of repose there.

17          Now, the Supreme Court, in CALPERS, talked

18   about the two different types of statutory timelines.  I

19   would submit they were trying to draw the distinction

20   there between a typical statute of limitations and a

21   statute of repose, which is supposed to give defendants

22   certainty.  The statute of limitations is usually more

23   based on equitable ideas of having -- encouraging

24   plaintiffs to bring their claims quickly.

25          But as the Supreme Court explained in John R.

1    Sand & Gravel, there are two types of statutes of
2    limitations, the jurisdictional type, like the one that
3    applies to our court, which sets -- doesn't have that
4    same character of the statutes of limitations that it
5    mentioned in CALPERS, but instead set a right bound on
6    the waiver of sovereign immunity, which is what the
7    Tucker Act statute of limitations does.  So because that
8    is a harder statute of limitations, it cannot be tolled
9    equitably in the same way that a statute of repose
10   cannot.
11          So now we have the Supreme Court that has
12   clarified for this Court and every other court that class
13   action tolling under American Pipe is equitable in nature
14   and we know from the Supreme Court and the Federal
15   Circuit that equitable tolling cannot be used to toll
16   Section 2501, and so putting the two together, it's clear
17   that American Pipe tolling, class action tolling, is not
18   available to toll 2501, the statute of limitations in
19   this Court.  And, therefore, because class action tolling
20   is not available, these claims, which were filed well
21   after the six-year statute of limitations expired, are
22   untimely and there's no jurisdiction in the Court for
23   those claims.
24          THE COURT:  I have some questions about those,
25   if you were about to move on to the other issues.

1              MR. SCHIAVETTI:  No, please, Your Honor.

2              THE COURT:  So one is about the -- the

3    Plaintiffs raise a distinction between opt-in and opt-out

4    classes for purposes of CALPERS and it sounds like -- I

5    guess the question is why isn't that relevant where

6    Bright was specifically about opt-in classes and CALPERS

7    was about an opt-out class?

8              MR. SCHIAVETTI:  Actually, Your Honor, so the

9    -- that is an important distinction for a number of

10   reasons.  So all of the cases that involve District

11   Courts, which are most of the cases that Plaintiffs rely

12   on, including American Pipe, Crown Cork & Seal, and some

13   of the 7th and 11th Circuit cases that they have cited in

14   their briefing, are about opt-in -- opt-out classes,

15   excuse me, in the District Court, which are different in

16   nature, which is why, in our briefing, we went directly

17   to Bright, because one of the other questions in Bright

18   was whether because the Court of Federal Claims has an

19   opt-in class procedure, whether class action tolling was

20   even going to be applicable in such a court.

21             And the Federal Circuit acknowledged there had

22   been a split in the Circuits among -- on that question as

23   to whether, in the narrow instances where you have an

24   opt-in class, whether you can have class action tolling.

25   One Circuit had said no; another Circuit had said yes.

1    The Federal Circuit answered that question with yes,

2    deciding that even in an opt-in class, you could have

3    that.

4           However, an opt-in class, of course, is

5    narrower and the opt-out class procedure in the District

6    Court, even before the filing of a motion for class

7    certification and a motion by a particular party to join

8    that class, all those class members are essentially

9    purportedly part of that class right from the beginning.

10   The default is they're in the class, whereas in an opt-in

11   class procedure, like the one in this Court, the default

12   is they're not in the class unless they ask to join it.

13          So that really also applies in -- to the second

14   argument regarding Big Oak Farms where you have the need

15   for the Court that -- recognized to incentivize

16   plaintiffs and this Court to use that motion for class

17   certification to start that process going so there can be

18   some additional certainty as to who is part of that

19   class.  There's more necessity for that here in this

20   Court versus the District Court with an opt-out class

21   procedure where the default is that every member of that

22   class you could qualify would be part of that class as a

23   default position.

24          THE COURT:  Okay.  So you're fundamentally just

25   saying that Bright sort of reasoned it wrong, even though

1    it was about opt-in rather than an opt-out.

2          MR. SCHIAVETTI:  Yeah, well, we certainly don't

3    challenge that aspect of the decision, the opt-in class

4    part of the decision.  The problem is the conclusion that

5    they made on the nature of the tolling, whether it's

6    statutory or equitable.  They concluded that it was

7    statutory in nature and the Supreme Court has undermined

8    and really eviscerated that portion of the opinion by

9    stating clearly on exactly the same question that it's

10   equitable in nature.

11         THE COURT:  So you don't see sort of an

12   interaction between the opt-in nature of it and the

13   equitable nature of this?

14         MR. SCHIAVETTI:  I think they're two separate

15   questions, Your Honor.

16         THE COURT:  Okay.

17         MR. SCHIAVETTI:  I don't think that there's --

18   that part of the question overlaps with the question of

19   whether it's based in equity or based on the statute.

20         THE COURT:  Then in Bright, the statute of

21   limitations was tolled only for class members to join

22   that suit rather than to bring a separate suit.  And in

23   Crown Cork & Seal, this Supreme Court held that there

24   wasn't a distinction between Plaintiffs who want to join

25   the original suit and those who want to bring a separate

1  suit.

2          MR. SCHIAVETTI:  Correct.

3          THE COURT:  But that wasn't under Section 2501.

4          MR. SCHIAVETTI:  Right.

5          THE COURT:  So does Section 2501 make a

6  difference in that analysis?

7          MR. SCHIAVETTI:  I don't think so, Your Honor.

8  I don't think it makes a difference whether the

9  Plaintiffs are seeking to join the same class after the

10 expiration or whether they're trying to file separately.

11 It's the same analysis either way.

12         THE COURT:  Okay.  And then in Bright, the

13 Federal Circuit had some comments about similarly

14 restrictive or jurisdictional statutes of limitation that

15 have been subject to American Pipe tolling.  So they cite

16 Stone Container Corporation and Arctic Slope Native

17 Association.

18         MR. SCHIAVETTI:  Right.

19         THE COURT:  Does CALPERS also call those cases

20 into question?

21         MR. SCHIAVETTI:  That's a good question, Your

22 Honor.  I haven't thought through that entirely.  I'd

23 have to reread those cases to be sure, but to the extent

24 that they are dependent on the idea that an equitable

25 tolling can apply to 2501, then, yes, because the Supreme

1    Court has made clear that equitable tolling cannot apply

2    to 2501, and now the Supreme Court has been additionally

3    clear that class action tolling is equitable in nature.

4    So therefore, any case that would have applied class

5    action tolling to 2501 would be called into question.

6              THE COURT:  And then the Federal Circuit also

7    focused on, in Bright, this sort of anomaly if 2501

8    couldn't be tolled, between the conduct of class action

9    litigation under the Tucker Act and the Little Tucker

10   Act.

11             MR. SCHIAVETTI:  Right.

12             THE COURT:  And the quote -- or at least sort

13   of a slightly shortened version of the quote is that one

14   class action filed in Federal District Court under the

15   Little Tucker Act can cover the putative class while the

16   same class action complaint filed in the Court of Federal

17   Claims cannot provide jurisdiction over the identical

18   putative class members.  In this respect, we would be

19   creating a regime in which the class action process in

20   the Court of Federal Claims was not just different from

21   the class action process in the Federal District Court,

22   opt-in versus opt-out, but was also so cumbersome and

23   unwieldy in its operation that unlike the process in

24   District Court, it frustrated the purpose of avoiding

25   multiplicity of suits.

1          So how -- under your theory that Bright is
2     wrong, how do you address that concern of the Federal
3     Circuit's?
4          MR. SCHIAVETTI:  It seems to me, Your Honor,
5     that that depended again on the difference between the
6     opt-in versus opt-out class.  I will acknowledge that I'm
7     not an expert on the Little Tucker Act, but to the extent
8     that it's subject to the same statute of limitations,
9     then it would have the same problem with equitable
10    tolling not being available there.  But in either
11    instance, even if those tensions are present, it simply
12    is not available regardless of the equities.
13         So again, that's really almost akin to an
14    equitable consideration or a consideration as to the
15    administration based on the Courts.  But the Court -- the
16    Supreme Court has been clear that none of those
17    considerations are available to look at the
18    jurisdictional time limit that's imposed by the Tucker
19    Act that provides a limitation on the waiver of sovereign
20    immunity that's contained there.  So even if those
21    tensions would be present, they really wouldn't affect
22    the analysis here where -- because class action tolling
23    is equitable in nature and such concerns are not
24    available to toll the Tucker Act statute of limitations,
25    you would have that result, at least in this Court.

1          THE COURT:  Okay.  And then one other question

2     about the fact that Plaintiffs never filed a motion for

3     class certification in Washington Federal and the

4     Plaintiffs here are arguing that Washington Federal never

5     got to that point and the Plaintiffs clearly intended to

6     make it a class action.  So I guess the question is like,

7     when should they have filed the motion for class

8     certification?

9          MR. SCHIAVETTI:  It's almost -- I mean, these

10    are really equitable concerns that they're mentioning.

11    It was almost unfair because they didn't have the chance

12    to file the motion for class certification.  I will say,

13    I mean, there were months of litigation before that case

14    was stayed so it's certainly not impossible that they

15    could have done so, but it's really besides the point to

16    say we're not faulting the Washington Federal plaintiffs,

17    we're not doing that.  To the extent that there's any

18    sort of analysis to that, as we mentioned, in their

19    briefings, the question is about whether these Plaintiffs

20    were entitled to continue to rely on Washington Federal

21    to toll the statute of limitations or not.  Even that is

22    really an equitable consideration that's just not part of

23    what the Court's analysis can encompass when looking at

24    2501 statute of limitations.

25          So the question really isn't was it Washington

1    Federal's fault.  Can we look at whether that's fair to

2    them because there was this stay in place?  Certainly,

3    there was an opportunity, given the time period that

4    elapsed that the case was pending for -- do I have the

5    entire timeline here?  Actually, I do.  That case was

6    filed in June of 2013 and it wasn't dismissed until 2020

7    -- July 2020.  So there was quite a bit of time in there,

8    including almost from June 2013 until February 2014,

9    before Washington Federal was stayed.  So there was

10   certainly an opportunity for the filing of a class

11   certification motion.

12          THE COURT:  But, I mean, that seems like that

13   would be an odd order of things to file a class

14   certification.  Like it would sort of be out of the

15   normal process, right?

16          MR. SCHIAVETTI:  That may be, Your Honor.  But,

17   again, these questions are really questions of equity

18   which don't apply in the analysis of the tolling of 2501.

19          THE COURT:  And I guess under your argument,

20   you would also have to -- they would probably have had to

21   have done it significantly earlier to the case before the

22   original limitations period ran, I guess if it -- sort of

23   putting aside your argument for the moment --

24          MR. SCHIAVETTI:  Correct.

25          THE COURT:  -- that tolling is unavailable,

1    period.

2          MR. SCHIAVETTI:  Yes, they would have had to

3    file before the original statute of limitations ran,

4    which would have been six years from September of 2008.

5    So 2014, if my math is correct, September 2014.  So yeah,

6    it would have had to -- they would have had something

7    over a year after they initially filed their complaint,

8    but would have had to file before the expiration of the

9    statute of limitations.  That's correct, Your Honor.

10          THE COURT:  Okay.

11          MR. SCHIAVETTI:  And that, of course, stems

12    from the Court's decision -- this Court's decision in Big

13    Oak Farms.  And one of the key considerations that the

14    Court looked at there is if we -- if the Court were to

15    provide all of the benefits of filing a class

16    certification motion just by nature of filing the

17    complaint, which contains class action allegations, then

18    why would any party even bother to file a class

19    certification motion?

20          Well, certainly, they wouldn't be incentivized

21    to do so.  So that was one of the things that weighed

22    heavily on, I believe, Judge Firestone in that case.

23          THE COURT:  And then quickly, before you move

24    on to the other, I guess, five independent grounds, I

25    guess -- well, two things.  One is you mentioned in your

1     opening brief that Congress provided a specific and

2     exclusive means for the enterprises to challenge FHFA's

3     appointment as conservator --

4               MR. SCHIAVETTI:  Correct.

5               THE COURT:  -- in an action in District Court

6     within 30 days of the appointment.  And, like, based on

7     that statement -- and I was sort of expecting to see an

8     argument about sort of effectively undermining the

9     statutory scheme by bringing a separate case here, and I

10    didn't really see making that argument.

11              MR. SCHIAVETTI:  We have made that argument in

12    the past, Your Honor, and the Federal Circuit was not

13    convinced by that argument in its analysis.  So we don't

14    repeat that argument here.  However, these -- the Federal

15    Circuit was clear that the applicable statute of

16    limitations for a takings claim is the Tucker Act statute

17    of limitations.  Now, a challenge to the conservatorship

18    still under HERA has to be filed in District Court within

19    30 days and it was not done so.  The Federal Circuit

20    found that that doesn't mean that Plaintiffs can't file a

21    takings claim to the extent that they have one.  Of

22    course, the Federal Circuit found that plaintiffs there

23    did not have one for a variety of reasons that we'll get

24    into.

25              THE COURT:  So that was in Washington Federal

1    that they --

2            MR. SCHIAVETTI:  Correct, Your Honor.

3            THE COURT:  Okay, got it.

4            MR. SCHIAVETTI:  Actually, I should say it was

5    either in Washington Federal or Fairholme.

6            THE COURT:  Okay.

7            MR. SCHIAVETTI:  But it was -- the analysis was

8    the same either way.  The Federal Circuit issued both of

9    those decisions on the same day, but it separated out the

10   Washington Federal analysis and decision because that

11   case focused mostly on the decision to impose -- to place

12   the enterprises into conservatorships rather than the

13   cases that were bundled in the Fairholme decision that

14   were decided there were focused mostly on the third

15   amendment to the PSPAs, which was in 2012.  So it was the

16   actions of conservator later in the conservatorship

17   process rather than the decision to place the enterprises

18   into conservatorship in the first place.

19           THE COURT:  Okay.

20           MR. SCHIAVETTI:  One more aspect on the tolling

21   -- the statute of limitations piece, Your Honor -- I'm

22   certainly happy to answer any further questions on the

23   issue -- is that the contract claims, of course, even if

24   the takings claims could benefit from class action

25   tolling under American Pipe, which they cannot as we've

1    described, however, even if they could, the contract
2    claims are not similar to any that the Washington Federal
3    plaintiffs raised and, thus, they cannot benefit from
4    such tolling.  So the Washington Federal plaintiffs did
5    not bring any contract claims.
6           Plaintiffs note that there is significant
7    overlap overall in the allegations in Washington Federal
8    and in this case, and we certainly agree with that.  As
9    we've said many times, the takings claims here are
10   substantively indistinguishable from the ones that were
11   raised in Washington Federal.
12          However, that's not true of the contract
13   claims, and the contract claims include some allegations
14   about the existence of a contract, not much in terms of
15   allegations, but which particular officials issued
16   particular statements that Plaintiffs assert constituted
17   a contract.  None of those allegations were present in
18   Washington Federal and because of that, those contract
19   claims cannot benefit from class action tolling.
20          Now, there are several courts -- a number of
21   courts in the country that require claim identity for
22   class action tolling.  Other courts have looked to the
23   standard that Plaintiffs rely on from Justice Powell's
24   concurring opinion in Crown Cork & Seal.  This Court has
25   not resolved the issue of which of those is applicable.

1    However, under either standard, the claims do not overlap

2    and do not benefit from that class action tolling because

3    there was no -- they do not share a common factual basis

4    and legal nexus so that Defendant would rely on the same

5    evidence and witnesses in his defense.

6            The evidence and witnesses that would be used

7    to defend the contract claim are just different from

8    those that would potentially defend any takings claim.

9            THE COURT:  I mean, there's some tension there

10   and it's -- I see it in obviously both sides' arguments

11   on -- you know, on one hand, it's close -- I guess, from

12   your perspective on one hand, they're close enough to --

13   I think you're arguing both have this preclusion problem,

14   but then, on the other hand, it's like too different to

15   allow for tolling.  And so I guess with -- I don't know,

16   it just --

17           MR. SCHIAVETTI:  I understand, Your Honor, that

18   there -- at the high level, there's tension in both, but

19   really their claims -- their arguments are fundamentally

20   incompatible and that's not true of ours.  So we have

21   consistently said that the takings claims are

22   substantively indistinguishable from Washington Federal.

23   It's exactly the same claim that the Federal Circuit has

24   already resolved.  It's not true of the contract claims.

25           They, on the other hand, are trying to mush

1    them all together to say, no, no, we're the same as

2    Washington Federal for the tolling piece, but then, no,

3    no, Washington Federal is totally different for

4    preclusion and for the binding nature of the Federal

5    Circuit's decision regarding a lack of a cognizable

6    property interest for it to base a takings claim on.  So

7    their positions are fundamentally incompatible where ours

8    are perfectly compatible and that was acknowledged that

9    the takings claims are exactly the same, the contract

10   claims are different.

11          THE COURT:  And then one other question on the

12   -- jumping back to the class certification question.  So

13   again, sort of putting aside whether tolling applies,

14   would Mr. Kelly have had to file his case before the

15   statute of limitations ran out when he saw that the

16   Washington Federal plaintiffs were not moving for faster

17   certification and time was running out?

18          MR. SCHIAVETTI:  Yes, Your Honor, that's

19   correct.

20          THE COURT:  Okay.  And then -- but that feels

21   like a little bit intentioned with the purpose of

22   tolling, which is to sort of reduce the number of

23   unnecessary filings.

24          MR. SCHIAVETTI:  That's true.  But as we

25   mentioned in our brief -- and perhaps I should have

1    listed the cases.  Plaintiff mentioned that we didn't do

2    that.  But we saw that procedure unfold in other

3    litigation in exactly this Fannie Mae/Freddie Mac

4    litigation mostly focused on the third amendment.  But we

5    did see that there were pending class actions --

6    purported class actions filed regarding the 2012

7    amendment to the PSPAs, that then we saw a number of --

8    and those cases had been filed in 2013, for example.  And

9    then we saw a number of additional filings in 2018 right

10   before that statute of limitations would have run out

11   because of exactly this issue.  There was concern,

12   presumably, by those Plaintiffs as to whether they might

13   have a statute of limitations issue.

14          So there were a number of cases, including Owl

15   Creek, Mason Capital, Akanthos, Appaloosa, CSS, 683

16   Capital, Wazee (phonetic) Street -- I mean, there were

17   quite a few cases filed in 2018 right before that statute

18   of limitations would have expired.  So there's no reason

19   that the Plaintiffs here couldn't have done the same

20   thing.  They wouldn't have had until 2018; they would

21   have had to do something in 2014, but they could have

22   taken that same precautionary measure.

23          THE COURT:  Okay.  Now, I'll let you move on to

24   the other grounds.

25          MR. SCHIAVETTI:  Certainly, Your Honor.  I'm

1    happy to focus on whichever parts you have questions on.

2    I'm happy to jump around.  Otherwise, I'll be happy to

3    turn to preclusion.

4            Because the Federal Circuit has already held

5    that substantively derivative takings claims identical to

6    those that the Plaintiffs present here, presented by

7    shareholders holding the same enterprise preferred shares

8    that are the -- upon which Plaintiffs ground their claims

9    fail on the merits as a matter of law, those claims are

10   precluded here.  Plaintiffs attempt to escape that

11   preclusion argument by, again, turning 180 degrees from

12   their arguments on statute of limitations and are now

13   distancing themselves from the Washington Federal case

14   saying it's a very different case with very different

15   claims.

16           It's just not true, however.  First of all, if

17   you just look at the two complaints, the allegations that

18   underlie the takings claims asserted here and the takings

19   claims asserted there are nearly identical.  It's true

20   that in the original complaint filed here, there were

21   illegal exaction allegations that have now been reframed

22   in the amended complaint, but the substance of the claims

23   is still exactly the same in both cases.

24           The idea is that there were certain limitations

25   that were placed by HERA as to when a conservator could

1    be appointed over the enterprises and both the Washington

2    Federal plaintiffs and the Plaintiffs here alleged that

3    those conditions were not met.  They allege that although

4    consent was one of the conditions under which

5    conservatorships could be imposed, there was no real

6    consent because the consent was coerced.  So it's the

7    same allegations in both cases.

8            Moreover, that wasn't even the basis of one of

9    the critical points of the Federal Circuit's analysis in

10   Washington Federal.  First, in Washington Federal, it

11   said that the first part of that -- the takings analysis

12   dealt with the fact that the Washington Federal

13   Plaintiffs were alleging illegality and it said under

14   Rith Energy, you cannot allege illegality in a takings

15   claim and you can't do it an illegal exaction claim

16   either when you have this other avenue to challenge a

17   conservatorship in District Court within 30 days.  So we

18   have to analyze this -- your takings claim, plaintiffs in

19   Washington Federal, as one challenging the imposition of

20   the conservatorships legally as a taking.

21           Then the Federal Circuit looked at exactly that

22   claim, which is the claim that Plaintiffs allege here,

23   and found that that failed as a matter of law, as well,

24   because there's no cognizable property interest that was

25   possessed by the enterprise preferred shareholders, the

1    shareholders -- actually common and preferred

2    shareholders in the enterprises possess no cognizable

3    property interest and, therefore, they could not base a

4    takings claim on that.  So that both is a binding

5    analysis for this Court in substantively analyzing the

6    takings claims were to do so; however, the Court should

7    never get there because preclusion principles bar the

8    relitigation of that same issue here.  It's exactly the

9    same issue.

10         THE COURT:  And it -- so okay.  You said both

11   versions of preclusion apply and, I guess, just quickly

12   running -- do you mind just running through the factors

13   of whichever one you think is --

14         MR. SCHIAVETTI:  Both apply here --

15         THE COURT:  -- stronger?

16         MR. SCHIAVETTI:  -- for different aspects.

17         THE COURT:  Okay.

18         MR. SCHIAVETTI:  These are claim precluded,

19   though.  These takings claims are the same claim.  And so

20   factors of a -- on the claim preclusion -- I'm sorry, I

21   don't have that in front of me, Your Honor, because I

22   wanted to quote for you the factors.  But essentially

23   because the -- it's the same identity of the parties

24   because, again, these belong to the enterprises.  So both

25   claims belong to the same party and they are based on the

1    same set of transactional facts and they've already been

2    litigated on the merits and cited on the merits by the

3    Federal Circuit.  That decision is binding on the same

4    Plaintiff here, which again is the same Plaintiff because

5    it's the enterprises that are the real party-in-interest

6    here.

7              So again, the --

8              THE COURT:  And under issue preclusion --

9    sorry, that just --

10             MR. SCHIAVETTI:  Under issue preclusion -- so

11   this is a claim preclusion argument here.  There are some

12   issue preclusion arguments to be made, for example, on

13   the derivative standing to assert derivative takings

14   claim, there's an issue preclusion argument there that's

15   based not on Washington Federal, but on Perry Capital,

16   and there's issue preclusion that could potentially apply

17   under the same -- you know, there are situations where

18   either claim or issue preclusion could apply at the same

19   time.  Claim preclusion is the better way to analyze

20   those when we're looking at the same claim as we are for

21   these takings claims.

22             THE COURT:  And then on the -- so then sort of

23   -- well, I'll let you go wherever you want to go next.

24             MR. SCHIAVETTI:  Sure.  So the first -- and

25   I've mentioned this, but it's simply not true that

1    Plaintiffs' amendment complaint does not allege that the

2    government action that they claim constitutes a taking,

3    was unlawful.  First of all, the complaint still uses the

4    word "unlawful" twice, the amended complaint.  But even

5    that aside, again, the argument is that the consent by

6    the enterprises was coerced and consent was the

7    justification for placing the enterprises in

8    conservatorship.  So if it was coerced, then there was no

9    effective consent and, therefore, placing them into

10   conservatorship would be unlawful.

11          So they're making the same argument that the

12   Washington Federal plaintiffs were making alleging that

13   the imposition of the conservatorships was unlawful and

14   the Federal Circuit clearly stated that they could not do

15   so having not availed themselves of the statutory option

16   to take such a claim to District Court within 30 days of

17   the conservatorship decision.  They could not do so under

18   the guise of a takings or illegal exaction claim in the

19   Court of Federal Claims under the Federal Circuit's prior

20   decision in Rith Energy.

21          Second, even if the Plaintiffs had successfully

22   exercised all of the allegations of illegality from their

23   amended complaint, the takings claim would still be

24   precluded by the Federal Circuit quashing a federal

25   decision for two reasons.  First, even if they were

1   distinct, the claims are based on the same set of

2   transactional facts.  Second, in analyzing the Washington

3   Federal takings claim, the Federal Circuit examined it as

4   if the plaintiffs had accepted the legality.

5           So the Federal Circuit analyzed and it said

6   that it had to analyze, so therefore it was not dicta.

7   It said that it had to analyze the same claim that

8   Plaintiffs allege that they are bringing here, accepting

9   the legality of the imposition of the conservatorship and

10  then, again, looking at whether that could constitute a

11  taking.  The Federal Circuit determined that it could not

12  because there was no cognizable property interest which,

13  as we'll get into with the takings aspect of it, applies

14  regardless of what type of taking it is, whether physical

15  or an ad hoc analysis, a regulatory taking.

16          In any of those cases, the Plaintiff is

17  required to rely on a cognizable property interest, that

18  aspect of the bundle of sticks, the Federal Circuit found

19  that the Washington Federal plaintiffs, who hold exactly

20  the same asset that the Plaintiffs here hold, did not

21  possess that bundle -- that stick in that bundle of

22  sticks and, therefore, didn't have a cognizable property

23  interest on which it could base a takings claim.

24          So a lot of this -- whether it's the preclusion

25  analysis or the takings analysis comes down to

1    Plaintiffs' assertion here that their claim is

2    fundamentally different than that in Washington Federal.

3    And they essentially make this argument based on the idea

4    that what the Government took from the Plaintiffs here

5    was Tier 1 capital.  It's simply not accurate.  It's a

6    misdirection, Your Honor.  The claim here is the same as

7    the claim in Washington Federal.  What the plaintiffs

8    held was shares in Fannie Mae and Freddie Mac.  That's

9    the same asset that the Washington Federal plaintiffs

10   held.

11         The claim is not that the Government took those

12   shares.  The Government did not physically take stock

13   certificates.  It didn't even take the shares in any

14   aspect.  In fact, the amended complaint pleads clearly

15   that plaintiffs retained those shares and were -- had to

16   sell them at a discount.  So they retained them, sold

17   them, received some value for their property.  So the

18   Government did not take them.  The Government did not

19   receive that final remuneration from the sale of the

20   shares; the plaintiffs did.  So the Government did not

21   take their shares.

22         What it comes down to is that those shares

23   declined in value and then, as a consequence, Plaintiffs

24   claim they fell below the Tier 1 capital requirements and

25   thus became insolvent.  But that's a consequential result

1    of the diminution in value.  It's not the Government

2    taking the shares.  And the Plaintiffs state, well, then

3    the Government took our banks because they went bankrupt,

4    but the Federal Circuit has been clear in Branch vs.

5    United States, California Housing, Golden Pacific

6    Bancorp, that placing a bank into receivership as a

7    result of them not meeting capital requirements cannot be

8    the basis of a takings claim.

9         So Plaintiffs have no way to get around this

10   issue.  They're trying to link two things that aren't

11   linked.  The basis of their takings claim is the same as

12   the basis of the Washington Federal plaintiffs' takings

13   claim, which is that their shares didn't -- that there

14   was a diminution in share value of their shares.  And we

15   can see that in the amended complaint.  In our reply

16   brief, I believe we listed a half-dozen or more

17   paragraphs in the complaint that clearly base the claim

18   on the diminution in value of the share.

19        And that's exactly what the claim is, is that

20   they bought shares, whether encouraged by the Government

21   or not, they bought an asset, that asset declined in

22   value.  The result of that decline in value was that they

23   fell below the Tier 1 capital requirements and became

24   insolvent and, thus, were placed into receivership.  That

25   cannot be the basis of a takings claim.  Under binding

1    Federal Circuit precedent, it was the same finding that

2    the Court has made in Washington Federal and in these

3    other cases that we've listed.

4            Also, we cited Georgia Pacific Corporation from

5    the Court of Claims establishing that it's long been

6    established that consequential damages from a taking

7    cannot be recovered by a plaintiff.

8            Now, again, aside from preclusion, the Federal

9    Circuit decided that plaintiffs could not -- in

10   Washington Federal, could not assert a cognizable takings

11   claim because they did not have a historically rooted

12   expectation of compensation because they were

13   shareholders in the highly regulated banking industry

14   and, thus, they don't have a cognizable property right

15   when the Government exercises its legal authority to

16   place a financial institution in conservatorship or

17   receivership.  That was the Washington Federal Court

18   relying on Golden Pacific Bancorp and California Housing.

19           Plaintiffs attempt to escape this conclusion,

20   but argue in their amended complaint -- again, takes this

21   Tier 1 capital, but even the way they define that, it's a

22   limitation, it's a requirement on the amount of capital

23   that Plaintiffs have to -- that a bank has to hold in

24   order to not fall under -- below those requirements and

25   become insolvent.  What they held is that Tier 1 capital

1   was exactly the same asset that the plaintiffs in

2   Washington Federal held, which is shares in the

3   enterprises.

4        Again, it's irrelevant whether the Plaintiffs'

5   amended complaint pleads a physical or a regulatory

6   taking because in either instance, the Plaintiffs would

7   need to plead a cognizable property interest that they

8   allege was taken, and the Washington Federal Court found

9   that the Washington Federal plaintiffs who held the same

10  asset did not have a cognizable property interest.

11       But, second, Plaintiffs don't allege a physical

12  taking.  Again, the Government did not take their shares,

13  did not take the financial value of their shares.  If

14  anything, there was a diminution in share value, which

15  the Court in Washington Federal held could not form the

16  basis of a takings claim.

17       As I've mentioned, to the extent the Plaintiffs

18  suggest that their bankruptcy constituted a taking,

19  they're wrong.  The Court rejected -- the Federal Circuit

20  rejected such assertions in Branch vs. United States,

21  California Housing, and Golden Pacific Bancorp.

22       Next, Your Honor, the Plaintiffs' takings

23  claims are derivative in nature and they lack standing to

24  bring them directly.  This was an alternative holding of

25  the Federal Circuit in Washington Federal.  Found that

1   the claims that the Washington Federal plaintiffs

2   asserted were direct in nature were actually derivative,

3   belonged to the enterprises and, thus, under third-party

4   prudential standing principles, the shareholders could

5   not assert them on behalf of the enterprises directly.

6   They would have to be only a derivative claim.  That same

7   analysis applies here to the claims that are asserted

8   here, Your Honor.

9        Also, as we've explained in our briefing, the

10  Plaintiffs lack standing to assert derivative claims.

11       And, finally, if I may turn to the Plaintiffs'

12  contract claims.  Those fail because they fail to

13  plausibly allege the existence of a contract with the

14  United States.

15       Plaintiffs chiefly rely on factual allegations

16  for these claims that may, if proven, demonstrate that

17  the Plaintiffs believe that their investment in the

18  enterprise's preferred shares was a safe investment and

19  that this belief was reasonable in light of government

20  policy.  But the problem for Plaintiffs is even if

21  they're correct, that's not nearly enough to establish

22  the elements of an implied-in-fact contract, which is

23  what they're alleging here.

24       That government policy permitted the banks to

25  count investment in enterprise preferred shares for their

1   Tier 1 capital requirements does not plausibly allege
2   that the Government guaranteed these investments.
3   Instead, these were investments in private companies that
4   the federal statute had, for decades, emphasized were not
5   guaranteed by the Government, and this was noted by the
6   Federal Circuit in Fairholme and also by this Court in a
7   variety of its decisions on similar grounds.  In fact,
8   the Angel decision by Judge Sweeney last year dealt with
9   somewhat similar allegations in another case involving
10  Fannie Mae and Freddie Mac.
11          That case is -- I don't believe cited in our
12  briefing.  I have a citation for you on that one if you'd
13  like, Your Honor.  That was 165 Fed. Cl. 453, Angel vs.
14  United States, in 2023.  It looked at some similar claims
15  of an implied-in-fact contract and found that there could
16  be no plausible implied-in-fact contract because the
17  Government, through the statutory law, had made clear
18  that these investments were not guaranteed by the United
19  States.
20          Moreover, in attempting to address their
21  failure to allege that any official with authority to
22  bind the Government in contract entered into the
23  agreement with them, Plaintiffs here assert that -- there
24  are allegations the government regulators approved or
25  encouraged these particular investments solves this

1    problem, but it clearly does not.  They didn't even

2    allege that these officials had authority to bind the

3    Government in contract, which not all government

4    officials do.

5         So it's not enough to say there was somebody

6    working for the Government who told us this was okay or

7    was a good idea to invest in enterprise shares.  They

8    have to allege that that official had the authority to

9    bind the Government in a contract to guarantee that

10   investment, which is what they're alleging.  And they

11   don't even allege that that's the case and that's a fatal

12   failure for that pleading.

13        Authority aside, merely encouraging or

14   approving Plaintiffs' investments falls far short of

15   committing the Government to compensate Plaintiffs if the

16   investments decline in value.

17        This is the missing element.  Although

18   Plaintiffs claim that the Government breached its promise

19   to guarantee the value of Tier 1 capital in the GSE

20   investments, they make no clear allegation that any

21   government official, let alone one with contracting

22   authority made any such promise to Plaintiffs.  Because

23   the Government was not in privity of contract with

24   shareholders, its action cannot breach any contract with

25   them.

1          THE COURT:  Could I -- just going back to the

2    first question I asked, just to sort of understand how

3    things fit together.  So let's assume there's no --

4    assume there's tolling, right, and we're looking at the

5    rest of your arguments.  So does preclusion apply to

6    everything?  Would that sort of address all of the issues

7    in the case or not necessarily?

8          MR. SCHIAVETTI:  Only the takings claims, Your

9    Honor.

10         THE COURT:  Only the takings claims.

11         MR. SCHIAVETTI:  That would be the first three

12   counts.  The two contract counts are only addressed by

13   the statute of limitations issue and then this last issue

14   that I've been discussing with the lack of privity, lack

15   of the existence of a contract with the United States.

16         The other issues, the preclusion issue, the

17   standing issues and the substantive merits issues on

18   whether there's a takings claim to be asserted here only

19   apply to those first three counts of the takings claims.

20         I'm certainly happy to address any other

21   questions you might have, Your Honor.  Otherwise, for

22   these reasons and those explained in our briefing, we

23   respectfully request that the Court grant our motion and

24   dismiss the amended complaint.

25         THE COURT:  Okay.  We'll reserve some time for

1   rebuttal.

2           MR. SCHIAVETTI:  Thank you, Your Honor.

3           THE COURT:  We'll hear from Plaintiffs.

4           (Pause in the proceedings.)

5           MR. RUYAK:  So, Your Honor, a lot of positions

6   have been taken by the Government, so I think what we're

7   going to try and do is put them in context.  And we

8   thought that rather than talking about the statute of

9   limitations first, we think that we have to talk about

10  it, as the Government suggested, in light of the actual

11  claims we've made, because what he wants to say is that

12  statute of limitations doesn't apply because the claims

13  are too different from what was in Washington Federal and

14  that's -- they are different, but not different enough

15  that they cause the statute of limitations not to be

16  tolled.

17          So I think what we want to do is kind of go

18  back to the beginning and I think the beginning is taking

19  our claims and looking at them as we made them so we can

20  see where they actually fit in.

21          And the other thing I wanted to say at the

22  beginning -- and I know we all know this; I know what the

23  standards are -- that the facts in the complaint should

24  be taken as true and there are inferences to be drawn in

25  our favor and our claims have to be plausible on their

1   face.  But I'm finding what the Government did in this

2   response to our complaint was not to do that.  They want

3   you to draw inferences favored to the Government and they

4   do it over and over again, and I think we've got to be

5   cautious of that issue when we do this.

6           And the other thing I think we need to be aware

7   of is what Justice Ginsburg said in the Arkansas Game &

8   Fish Commission case.  The other standard of

9   consideration in a takings case is that because the

10  Government takes property, there's a categorical duty to

11  compensate.  And there's no set magical formula because

12  there's nearly an infinite amount of ways that the

13  Government can take property.  And so we can't just, as

14  the Government is trying to do, mash it all in and hold

15  it under one umbrella of Washington Federal.  It does not

16  work.  And that's why I think if we look at the claims

17  first and what we're claiming, we can show that that's

18  the case.

19          So let's look at the main claim, which is our

20  constitutional taking claim.  There's four elements of

21  that.  We know what they are, the taking of the ownership

22  by control or destruction, government action, public

23  purpose, compensation.  Three of those we're not talking

24  about here because the Government didn't dispute them in

25  this motion.  What the Government disputes is the

1   destruction of private property, the taking of private

2   property, and whether it's compensable under the 5th

3   Amendment.

4           The Supreme Court -- Justice Ginsburg also said

5   that the compensable property is the bedrock of it.  And

6   why?  Because it's a constitutional claim.  We're not

7   making a statutory claim; we're making a constitutional

8   claim.  And under the Constitution, it doesn't say how

9   the Government acted, it's not limited in what they did

10  to take the property, it's what was taken.  That's the

11  issue that you have to go to, the nature and character of

12  the property taken.

13          Did the owner have that bundle of sticks, the

14  right to exclude, the right to use, to exclude others?

15  Was it direct?  Did the Government action directly take

16  the property?  And in the case, was it a seeable or

17  intended result by the Government?

18          And I think when we go through our complaint,

19  it's very clear that that's the case.  The property that

20  we're seeing is taken was not the GSE stock, per se.

21  What was taken in this case was assets of the banks.

22  That's what our complaint is about.  And not all the

23  shareholders in Washington Federal had that claim because

24  they had foreign governments, private individuals,

25  venture capital funds.  They didn't have this thing

1    called Tier 1 capital.

2           Now, that's essential because the regulators

3    who took the banks in the beginning set up this whole

4    scheme for Tier 1 capital.  It's the amount that's

5    required for solvency in a bank.  And for generations of

6    time, it could have only been two things, U.S. Treasury

7    Bonds and cash.  Why?  Because those were the most secure

8    things in the world.  And the purpose of the regulators

9    was to say, you've got to have this capital because we,

10   as the Government, don't want to have to back you up with

11   our FDIC insurance that we all have when we make bank

12   deposits.  So you have to have this.  It's sacrosanct.

13   Failure to maintain means immediately we put you into

14   insolvency and insolvency means we put it in a

15   receivership and we take our bank completely.  It's gone.

16   That's how important it was.

17          The analogy I use is like the heart, okay?  You

18   can take off a toe or an ear or even an arm, right?  But

19   if you take the heart out, you grab and take that heart

20   out of a person, the body dies.  And that's what Tier 1

21   capital was for the banks, plain and simple.

22          So what happens?  Okay.  Around 2006 and '07,

23   they wanted to put more money into Fannie Mae and Freddie

24   Mac.  So they went out in the market and they got some

25   money from people, but they didn't get enough.  And this

1    is in our complaint.  So what did they do?  Five

2    agencies, not one, Treasury, the Fed, the FDIC and OCC

3    and IRS got together and said, you know these banks have

4    all this money that we made them keep there in bonds and

5    cash, it's sitting there for us, let's get that money and

6    put it into Fannie Mae and Freddie Mac.  Let's get the

7    banks to take it and convert it for us for our benefit.

8            So they created this creature, this new asset

9    class called GSE stock, Tier 1 capital.  That's what they

10   created and that's in our complaint.  And this is not

11   just supposition by lawyers, it's all documents in our

12   complaint by government documents and regulations.  Only

13   the banks have this, no one else.  And they induced the

14   banks to do it by giving them all kinds of special tax

15   benefits, by telling them that if they sold it, they

16   would only have to get taxed on a certain amount of it,

17   they'd get these big dividends, 11 percent, and the

18   assurance and promise that this new asset was just as

19   safe and secure as U.S. Treasury Bonds and cash.

20           Because for truth -- and we have evidence in

21   the complaint, testimony -- no bank would have done it

22   without that guarantee and the regulators would not have

23   done it because the regulators were supposed to make sure

24   that the banks were secure.  So they came up with this

25   new creature and this new creature was capital.

1          But what were the assurances that the

2   Government gave?  A lot of them.  They said that this

3   satisfied the Tier 1 solvency mandates.  You can take up

4   to 100 percent of your Treasury Bonds and your cash, give

5   it to us, and we will give you this other asset called

6   GSE Tier 1 capital and it's just as good, just as good.

7   And they said it would not risk the bank's solvency.  And

8   multiple government agencies supported it, not one, all

9   of them together supported it.

10          And so when the Government says that these

11  banks didn't have a reasonable investment expectation.

12  They certainly did.  And what was that expectation?  It's

13  in our complaint.  That the Government would not take any

14  action to destroy the value of that GSE 1 capital.  The

15  bank gave it.  The bank can't just take it away.  And

16  that applies to what this was.  This is the property that

17  we're saying under the 5th Amendment was taken.

18          So what are the issues in this motion?  I think

19  it really comes down to this property issue, Your Honor.

20  I think the only thing the Government really complains

21  about is that they don't want to accept the fact that the

22  Government took this particular kind of property of the

23  bank, this asset of the bank, together with all the

24  others, because once they took that, solvency,

25  receivership, taking of everything else.  Direct and

1    certain.

2          They argue that it's consequential.  It's not

3    consequential.  And we have all the cases that say that

4    and we'll go through it.  They say that the property is

5    irrelevant and illusory.  How can it be irrelevant?  It's

6    -- 100 paragraphs in the complaint describe this whole

7    process, backed up by government documents and admissions

8    by the highest people in the Government.

9          Direct taking allegations.  This is what

10   happened in this case.  The Bush Administration -- and I

11   say that because it's very clear, you know, Henry Paulson

12   wrote it in his book.  We don't need to ask him again.

13   He wrote -- he met with the President of the United

14   States, with the Secretary -- he was the Secretary of

15   Treasury, the Federal Reserve Chairman, the head of the

16   FDIC.  They put this plan together because the financial

17   system was going down the tubes at that point.  Not

18   because of what our bank planners did.  They were save

19   and secure.  They didn't have some subprime mortgages.

20   They were fine.

21         Matter of fact, if the Government hadn't

22   created this GSE 1 capital thing and suggested that it

23   was just as good and made it just as good, we wouldn't

24   even be here today.  You know what?  Because Mr, Kelly

25   and his banks would be still operating with U.S. Treasury

 1    Bonds and cash and none of this would have happened.

 2          But the administration decided we've got to

 3    take over the GSEs, it's the best way to do it.  We've

 4    got to seize them.  And we're not complaining about that.

 5    Our claim doesn't depend on what was legal or illegal by

 6    HERA.  HERA is irrelevant to us.  The Government could

 7    have taken it by Executive Order, by act of Congress.

 8    The Government could have taken any way to do this.  They

 9    used it as a tool to take.  And it wasn't illegal.  We

10    don't claim it's illegal.

11          THE COURT:  Do you have any cases -- I'm

12    curious about the act of Congress thing because I --

13          MR. RUYAK:  Yes, Your Honor.

14          THE COURT:  Do you have cases that -- where

15    there was a taking that was affected by a statute and

16    that -- where Congress is sort of implicitly the

17    sovereign immunity to sue for it?

18          MR. RUYAK:  Well, I don't think this is a

19    question of waiving sovereign immunity because the

20    Constitution gives us the right, as the 5th Amendment, to

21    sue the Government for this because the Government's

22    required to give us compensation.  But, yes, a good

23    example is the last financial crisis before this one when

24    the savings and loans were in trouble, right?

25          And the savings and loans were in trouble and

1    so the FDIC took a very healthy savings and loan,

2    Winstar, and they said, we want you to take over this

3    failing savings and loan because we don't want to back it

4    up.  We want you to take it over.  And they said, you

5    know, you have this thing, Tier 1 capital, but tell you

6    what, there's no capital coming in, so we'll let you take

7    things like goodwill and count that as Tier 1 capital.

8    That's what happened in that case.

9            And so Winstar did it.  They took on the

10   failing savings and loan.  They rearranged their -- they

11   said, oh, well, we've got goodwill, whatever that is, you

12   know, that's counted as their capital.  A year later, the

13   legislature passed a law to say, savings and loans can't

14   count goodwill.  It has to be hard cash or Treasury

15   Bonds.  And so immediately the savings and loans went

16   insolvent, right?  That doesn't -- that's still -- that's

17   an example of where government action creates a taking,

18   right?  It doesn't matter whether it's by statute, by

19   Executive Branch of the Government.  As a matter of fact,

20   the Constitution doesn't say that.

21           It says, taking by the Government for public

22   purpose requires compensation.  There's no -- in the law

23   over the years, there's no government legislative action

24   can compromise a bridge or a limit of that constitutional

25   provision.  Statute can't do it.  Because, you know, that

1    same -- in that same 5th Amendment paragraph, it protects
2    us against double jeopardy, self-incrimination, ensures
3    due process, and it says the Government can't take
4    private property without just compensation.  It's rooted
5    in the very -- the Bill of Rights.
6            Why is that important?  Because without the
7    Bill of Rights, we wouldn't have a Constitution.  It
8    would have never been ratified.  But when you look at the
9    Constitution in the cases, even Arkansas Game with
10   Justice Ginsburg saying, this is a mandatory thing, you
11   can't throw statutes like HERA in front of it to trip
12   over that right and take it away.  No way.  If there was
13   a taking, if it was a direct taking, then the Government
14   must compensate.  And, of course, compensation is a
15   different issue here.  We're just at the first stages of
16   this.
17           THE COURT:  May I ask about -- so you were
18   talking about the Tier 1 capital as being kind of unique
19   --
20           MR. RUYAK:  Mm-hmm.
21           THE COURT:  -- and not addressed in Washington
22   Federal.
23           MR. RUYAK:  Right.
24           THE COURT:  So then why wouldn't Mr. Kelly have
25   filed his own case before the statute of limitations ran

1    out, because it sounds like he was relying on that case

2    for tolling as a putative class member there.

3          MR. RUYAK:  Yeah, yes, Your Honor.  I think

4    this gets back to that very basic issue here of how this

5    works.  And how it works is, the purpose of class action

6    tolling is very simple.  We don't want to have a million

7    cases filed.  So we allow people to have a -- make a

8    class complaint.  Lawyers do that on behalf of a class.

9    They define the class.  Mr. Kelly was in that class.  All

10   the banks technically were shareholders in the GSE stock.

11         He didn't know for sure what claims would come

12   out of that and he certainly didn't know whether, in the

13   end, when a judge finally decided what the class was,

14   whether there would be subclasses, which often is the

15   case, and whether he'd be excluded from the class because

16   his claims were a little bit different.  But the whole

17   purpose of the class action vehicle and tolling is to

18   keep everybody in the tent until those decisions are

19   made.

20         In this case, we never got to that point, but

21   it would be totally unjust to say, look, you're in a

22   class, you're one of the people that's directly affected

23   under this complaint, but in case, you know, you're not

24   in it, you're done.  You'd have to -- because then we

25   would say, I'd have to revise every client in a class and

1    say you're going to have to file your own claim because

2    we don't know what these class action lawyers are going

3    to do.  They might make your claim; they might make

4    another claim.  They might not properly get the

5    subclasses in place.  You can't -- there's no privity

6    between that lawyer and a class member.

7            But this happens all the time, and I think that

8    tells you why statute of limitations doesn't apply here.

9    It doesn't apply because class members can have a

10   different theory on which they're harmed and can have

11   different harm.

12           A good example is the General Motors case.

13   I've used that as an example.  That's another takings

14   case when -- during World War II, the Government was

15   taking all kinds of warehouses.  All over the country,

16   they were taking warehouses.  And one of them was the

17   General Motors warehouse.  And some of these warehouses

18   didn't have anything in them.  They were empty, not being

19   used.  Others had equipment, machinery, materials, and

20   all that.  And the Government said, no, to General

21   Motors, we took yours and you had all that other stuff,

22   but we only owe you for the warehouse, that's all we owe

23   you for.

24           Well, if that were a class action, where would

25   you be?  Does that mean that General Motors can't claim

1    that other loss of government property?  The Government

2    took it and disposed of it, destroyed it.  The Supreme

3    Court said in General Motors, no, that's a loss, too.

4    Yes, they intended to take the warehouse, but then when

5    they took it and they found the stuff in it, they threw

6    it out and destroyed it, that's property, too, under the

7    5th Amendment.

8              So you can have people with different claims

9    and that's the way it works.  And until you get to the

10   point where you're defining the class and saying what it

11   is, you may have subclasses.  I think the bank here would

12   have been a subclass because the bank -- what was taken

13   from the banks was so much more than was taken from

14   shareholders.

15             Remember, in Washington Federal, that case

16   turned on the fact -- on two facts.  One, the only claim

17   that the Federal Circuit looked at was one of an illegal

18   application of the statute.  And for some reason, in that

19   case -- and I don't know why -- they relied upon that

20   statutory basis as a taking and they wanted -- and they

21   said it was a legal taking.  But the only thing that they

22   said was taken there was -- they kept their stock.  The

23   shareholders still had their stock.  The value went down

24   and then later, a year and a half later, they weren't

25   paid dividends they said they should get.  And the

1    Federal Circuit said, no, that's not -- and by the way,

2    the Government made a total misstatement of our

3    complaint, which is not true.  He said that we still held

4    our stock.  Not true.

5            For every one of our banks, when they went

6    insolvent and the Government took it, they took all the

7    assets including the stock and the stock shares.  The

8    only plaintiff we have in the complaint where we said we

9    had to sell the stock was River Capital, which is a

10   different plaintiff.  We have to talk about them

11   differently because they were not a bank and they

12   maintained their stock because the Government didn't take

13   them over.

14           But each one of these nine banks, when they

15   were taken over, the stock went with it.  They didn't

16   have it anymore.  The other -- and there were a number of

17   reserves these banks had.  They had reserves for loans;

18   they had reserves for mortgages; they had general

19   reserves; all kinds of assets.  And the Government didn't

20   just take the Tier 1 capital, they took all those

21   reserves in the taking.  But, more importantly, Your

22   Honor, the Government has certainly admitted that this

23   was a taking.

24           And I want to raise this issue because this is

25   the most recent Federal Circuit authority, I think, for

1    the proposition that what we've alleged as compensable

2    property is, in fact, compensable property.  It's by

3    Judge Moore.  It came out the day after we filed our

4    opposition, so we didn't have it at the time.  But Judge

5    Moore really -- and this case, Ideker Farms vs. U.S., 72

6    F.4d 964, she went through the whole ramification of this

7    because this was a situation where direct versus

8    consequential was involved and it dealt with the

9    Government flooding lands and they didn't want to pay for

10   the crops they destroyed, just the land, the value of the

11   land.

12           And so Judge Moore did a good thing of she went

13   through all the Supreme Court cases.  She significantly

14   summarized things in a good way and she said, look,

15   direct is the appropriation of the owner's distinct

16   property interest.  And these banks had a distinct

17   property interest in this Tier 1 capital because without

18   it, they were dead.  And they also had a distinct

19   property interest in all the other assets that were taken

20   when that went dead.

21           More importantly, she decided what's

22   consequential, and that also comes out of other cases

23   like even back in Monongahela River in the 1890s.

24   General Motors clearly did this.  Armstrong -- Armstrong,

25   a case we rely upon, a very similar thing.

1        Consequential doesn't mean the vernacular.

2  It's a consequence.  Consequential is a defined term of

3  art in the law.  It talks about things like lost profits,

4  lost goodwill, having to reposition the business, all

5  those things that are remote and indirect.  Now, in a

6  contract case, you could probably claim those, but under

7  the 5th Amendment law it says, no, it's got to be an

8  actual taking, a direct taking.  But we haven't alleged

9  any of those things.  We're alleging only assets of the

10 banks.

11       And she also says -- and the Government loses

12 this -- well, they didn't happen all at the same time,

13 but Judge Moore says, well, that doesn't matter under the

14 Constitution.  Past, present, and future damages are all

15 recoverable as long as they're a taking and a direct

16 taking.  And, most importantly, and it's applicable here,

17 is that a property of a business is compensable if taken

18 or destroyed by government action.  That is critical and

19 that's what happened here.

20       But I think, Your Honor, the main reason that I

21 think this all comes back to roost is the fact that in

22 our complaint -- as I said before, we're not relying on

23 legal theories of lawyers writing supposed things.  This

24 is a key element and this is a key thing I wanted to talk

25 about.

1          THE COURT:  Can I --

2          MR. RUYAK:  Okay.

3          THE COURT:  After that, can we talk about

4    tolling and all of these things?

5          MR. RUYAK:  Yes, yes, Your Honor, yes.

6          THE COURT:  Okay, thank you.

7          MR. RUYAK:  For this reason alone, this motion

8    should be denied, because when you read our complaint and

9    go to these four things, these are admissions by all of

10   the people that were involved in creating this GSE

11   capital, the Tier 1 concept, and they were the people

12   that ultimately forced the insolvency and took over the

13   banks and all their assets.  Isaac, the FDIC Chairman,

14   he said that what happened here was because of the taking

15   of the conservatorship of the GSEs, that it was an ambush

16   to make the banks fail because they created that

17   property.

18          Paulson, on the morning -- on the morning that

19   the conservatorship went in place of the GSEs, he issued

20   a statement saying, we know what this is doing and so the

21   banks who are going insolvent need to get in touch with

22   their regulators right away.  What could be more direct?

23          Later, in a book written by two of the Board

24   Governors of the Federal Reserve, Rice and Rose, they

25   said that the -- these banks -- they even mention Mr.

1    Kelly's banks -- they failed solely due to the GSEs' T1

2    capital takings in the seizure.

3              And testifying before Congress, the OCC

4    regulator, I think it was Mr. Dugan, said that -- he

5    agreed that it was a direct taking by -- these banks were

6    directly taken by that seizure.  And even in the case of

7    the U.S. Attorney in the Southern District of New York

8    said the same thing.

9              It can't be more direct.  And particularly in

10   this case, Your Honor, given the standards for a motion

11   to dismiss, we need to be able to go forward on this, we

12   need to be able to go forward on this case.  But you can

13   see why preclusion either claim or issue doesn't work

14   here.  The Government argues that it's the same

15   violation.  It's not.  We're not alleging a statutory

16   basis for the taking.  It's a direct constitutional

17   basis.  It's not the same compensable property.  We're

18   not asking for the loss in value of the stock and

19   dividends.  That's not what we're seeking here.

20             We, frankly, could care less about that because

21   what happened here was the Government took all of the

22   Tier 1 capital that was previously in U.S. Treasuries and

23   cash, but the Government, you can say, lured, induced,

24   promised, whatever, and all the other assets of the

25   banks.  And it's certainly not derivative because the

1    GSEs had no ownership whatsoever over the bank's capital

2    or its assets, any of it.

3         So we have -- we just have another slide that

4    just -- I'm showing the differences.  But there's no --

5    there's not possibly any claim identity here.  It doesn't

6    exist.  We have a different theory upon which a liability

7    is based.  We have different compensable property that

8    was taken.

9         THE COURT:  Which of these bases do you think

10   is the sort of most persuasive or strongest one?

11        MR. RUYAK:  Well, I think they actually vie for

12   two.  The one is that we didn't bring a legal extraction

13   claim here.  We didn't -- our taking isn't dependent upon

14   a particular statute.  We certainly didn't allege HERA.

15   We didn't allege -- he says the word "coercion," but the

16   reason we used the word "coercion" -- and we explained

17   this in our brief -- is that you've got to show

18   government action.  It can't be a gift to the Government.

19   It can't be -- for example, if the GSE board had just

20   said, oh, we're going to just give everything to the

21   Government, we'd have a problem here, because we're

22   saying it had to be government action.

23        Government action means you take the property

24   against the will of the owner and so you have to show

25   force or coercion as an allegation, and we had it here.

1    Because it wasn't the GSEs themselves that did this, it
2    was the Government stepping in and seizing it.  As Mr.
3    Paulson said in his book, we were going to seize them one
4    way or another, we had to do it.  No one was saying that
5    they were voluntarily doing this.  And that's what the
6    coercion is.  It's not illegality.  It has nothing to do
7    with illegality.  It's that the Government did it.
8           But I think that, you know, we're not using the
9    statutory basis, but also the property we're claiming is
10   different property.  That doesn't mean we're not under
11   the statute of limitations.  Different people that are --
12   this was the largest seizure of private property that
13   ever occurred in this country in the 200 years of its
14   existence at that time.  The largest seizure that ever
15   occurred.  And there were a bunch of people hurt by that.
16   Some couldn't collect based upon the Constitution, like
17   we can, but a lot of people were hurt and not everybody
18   was hurt the same way.
19          And so the property interest that they claimed
20   in Washington Federal, in which, most importantly, you
21   can't be precluded by a ruling by the Federal Circuit
22   unless they address the issue, they deal with that issue,
23   they deal with that claim.  And it wasn't even alleged or
24   considered by the Federal Circuit, what we're talking
25   about in terms of the property taken from these banks.

1           THE COURT:  Well, I guess the -- I mean, the

2     rules of preclusion are sort of designed to prevent

3     plaintiffs from kind of taking the same set of underlying

4     facts and repleading them as different types of claims.

5           MR. RUYAK:  Mm-hmm, yeah, right.

6           THE COURT:  So I guess the question is what

7     precise set of facts here is different than that in

8     Washington Federal?

9           MR. RUYAK:  Okay.  I think that a lot of the

10    facts are similar because it arose from the same

11    transactional facts, that the Government found -- you

12    know, had a problem.  They sold the stock, they had the

13    GSEs.  They were independent companies.  They weren't

14    government entities; they were independent companies.

15    And so when the financial crisis hit, they had to do

16    something and they did it.  And nobody questions that.

17    Those are the facts.  They took over these GSEs.  But

18    when they did that, what did they take of private

19    property of individuals?  And that's where things go in

20    different directions.

21           In the Washington Federal case, the lawyers who

22    brought that case for the class, maybe because they had

23    so many different kinds of class members, they limited

24    their claims to alleging a statutory claim -- a statutory

25    claim that the Government created this HERA statute and

Michael Kelly, et al. v. USA                    3/11/2024

1    they used it improperly and illegally to take over the

2    GSEs.  That was their claim.  And because they also had

3    people who still held all this stock and didn't lose it

4    by what happened to the banks, by insolvency and

5    receivership, they still had stock and what they were

6    complaining about is, gee, my stock value went down and I

7    didn't get my dividends that I was promised.  That's all

8    they claimed.

9         But, here, the property taken here was

10   something entirely different.  It was this category of an

11   asset category created by the Government for their own

12   benefit.  To get the money from these banks, they created

13   this safe and secure asset and then not -- maybe not

14   intending to do it from a bad point of view.  We're not

15   alleging fraud or anything.  But when the Government

16   destroyed that value by taking the GSEs, they destroyed

17   the very thing they created for the banks that kept them

18   safe and secure, which meant immediate insolvency,

19   receivership, and taking everything.  And that's the

20   difference.  That's the difference in the claims.

21        I would like to address -- did you have any

22   other questions on that, Your Honor, or --

23        THE COURT:  No.  I guess going back a little

24   earlier, you were talking about the incentives that were

25   offered for banks investing in enterprise stock --

```
 1            MR. RUYAK:  Yes.

 2            THE COURT:  -- and, I mean, I guess, should

 3   banks have naturally assumed there was at least some

 4   downside risk in doing that if there's a bunch of

 5   incentives?

 6            MR. RUYAK:  No, Your Honor, because -- because

 7   the reasonable expectation is not that the stock might

 8   fluctuate, but, of course, it might, right?  Of course,

 9   it might fluctuate some.  But the expectation here was

10   that the Government wouldn't do anything to destroy the

11   value of it.  That's a different thing.

12            I come to you and I say, you know what, you've

13   got a nice house, you don't have a mortgage, let me give

14   you a mortgage on your house.  I'll give you some money;

15   I'll take your mortgage.  And as long as you pay the

16   mortgage, I won't come and try to take your house.  And

17   then I ignore it and I go to court and I try to take the

18   house because you owe me -- 80 percent of your house is

19   in -- you know, under my mortgage.  That's the kind of

20   thing that happened here.

21            The Government made a commitment, they made a

22   -- whatever you want to call it, they made this thing.

23   It wasn't just -- it was a thing.  It was Tier 1 capital.

24   And the bad part about this, Your Honor -- and that's why

25   we have the implied contract claim as sort of another
```

1    alternative to look at the same thing, is that there were

2    all these promises made that, you know, take what is so

3    safe and secure, there's no risk in it, and we're going

4    to give something that's just as safe and secure and no

5    risk.  They were guaranteeing it.  I'm sorry, they were

6    guaranteeing it.  They were at least guaranteeing that

7    they would not do something to take it away.

8          THE COURT:  Is it -- I guess another question

9    is -- and I'm trying to sort of understand the

10   distinction between it becoming -- creating a contract or

11   being a taking versus sort of a tort that there was some,

12   you know, misstatement that there was zero risk and then

13   it turns out there's risk.

14         MR. RUYAK:  No, I don't think -- I think the

15   government regulators believed it.  I think they really

16   thought because they were backing up -- the GSEs had

17   government support in it, right, that I think that the

18   regulators came to the banks and said, gee, this is a

19   great idea, it's just as good as Treasury Bonds and cash

20   because the Government is backing up the GSEs, what could

21   go wrong?  And we can put more money in and it's all --

22   so I think the regulators believed it.  I don't think

23   there's any fraud here.  I think the Government intended

24   to support that and to not destroy it.

25         But what happened was something unprecedented.

1    There was this financial crisis that needed a resolution

2    and, unfortunately, the resolution became, we've got to

3    do what we don't want to do, but we're going to take over

4    these -- this Fannie Mae and Freddie Mac because that's

5    our best solution.

6           I don't think there's a fraud here.  I don't

7    think there's a tort here.  I think it's the fact that

8    they really -- and I think if you look at -- I mean, I

9    have a slide on this.  What's the one on the -- is it the

10   next one?  What's the one on the contract?

11          Oh, here.  I think it's all there, you know.

12   The Government created this thing and made an offer to

13   the banks.  It's a typical contract.  There was privity

14   here.  The Government said, we'll create this, you'll do

15   it.  The banks accepted it.  The consideration was the

16   bank gave $900 million to the -- for the GSEs, $900

17   million.  The banks' consideration, they got the tax and

18   financial incentives and this guarantee of safety that

19   the Government wouldn't destroy it.  And the breach was

20   simply not intentional, as I say, but they had to do it.

21   If they have to do it, it's a breach.  Even if it's -- it

22   doesn't have to be malicious, it doesn't have to be

23   intended to be bad.

24          But I want to talk about the privity, too,

25   because one thing that the Government said is there's no

1    privity here.  Oh my God, how can there not be privity?

2    The four entities that created this thing and made the

3    offer were the Federal Reserve, the Treasury, the FDIC,

4    the OCC, and the IRS.  If they didn't have authority to

5    bind the Government to what they were doing, then there

6    is no authority.  The President of the United States

7    didn't have to come visit the bank and say, oh, I'm

8    committing to this.  That was the authority.

9              And to say there wasn't a privity of contract,

10   that this wasn't an offer and acceptance and massive

11   consideration given both ways, and then the Government

12   steps in, the very thing it created, unintentionally, but

13   it had to, it destroyed and breached that.  So now the

14   banks are left with --

15             THE COURT:  But can you talk about --

16             MR. RUYAK:  -- absolutely nothing, goes into

17   insolvency and loses everything.  That's the government

18   act that created it.  So I do think we have -- for

19   purposes of a motion to dismiss, for sure, we have a

20   claim for implied contract that is very plausible on its

21   face.

22             THE COURT:  Can you talk about the tolling

23   question?

24             MR. RUYAK:  The statute of limitations tolling?

25             THE COURT:  Yeah.

1          MR. RUYAK:  Yeah, I'd like -- I'd also -- I'd

2    like to have -- Mr. Diamond is prepared.  I don't want to

3    deny him his ability to talk to you.  So I think he's

4    going to address the tolling issue if that's okay.

5          THE COURT:  Okay.

6          MR. RUYAK:  Is that okay?

7          THE COURT:  Sure.

8          MR. RUYAK:  Okay.  And then I think -- let's

9    see if there's anything else that we have left.  Is that

10   the last piece?

11         MR. DIAMOND:  Yes.

12         MR. RUYAK:  That's the last piece.  Okay.

13         THE COURT:  Thank you.

14         MR. DIAMOND:  Thank you, Your Honor.  Allan

15   Diamond on behalf of the Plaintiffs.  I appreciate the

16   accommodation.  I'm going to be prepared, hopefully, to

17   address all your questions with respect to tolling,

18   jurisdiction, limitations.

19         I'll start with the complaint in this case

20   absolutely was timely filed.  I don't think there's even

21   any dispute about it, subject to whether the class action

22   tolling applies.  So that we're all clear as to what

23   those dates are, the -- well, the Plaintiffs are entitled

24   to class action tolling as a matter of law, which we

25   submit is absolutely the case here, but there's no doubt

1    by anyone that Plaintiffs' complaint in this case was

2    otherwise timely filed.  Why is that?

3              Let's take a look first -- and I have a chart

4    if we could pull that up.  Everyone understands that the

5    Tucker Act has a six-year statute of limitations.  The

6    Government unilaterally pinpoints September 6, 2008, the

7    date on which the FHFA director decided to place the GSEs

8    into conservatorship as the triggering date for purposes

9    of accrual of the statute of limitations.

10             I just want to say that we don't necessarily

11   agree with that.  I actually think that the triggering of

12   the statute of limitations probably didn't happen until

13   much later.  But for purposes of this motion, we're

14   willing to concede and accept that even if you take

15   September 6, 2008, which is the earliest, earliest date

16   that that triggering event could possibly have happened,

17   we're still timely filed.

18             If you take the six-year statute of

19   limitations, which is 2,190 days, and you look at when

20   Washington Federal filed its case on June 10, 2013,

21   that's 1,739 days out of that six-year 2,190 days, and

22   then you see the date on July 9, 2020, when Washington

23   Federal was dismissed.  So if you take the 1,739 days

24   during the period in which Washington Federal was in

25   existence, subtract it from the six-year statute, you're

Michael Kelly, et al. v. USA                    3/11/2024

1    left with 451 days.  If you tack on 451 days to July 9 of
2    2020, the dismissal date on Washington Federal, you get
3    October 3rd, 2021.  This case was filed on October 1st,
4    2021, two days before that date.
5           Like I said, I think there's arguments I can
6    make -- that I don't think we need to -- relevant here as
7    to why the statute of limitations didn't start running
8    until later, but even if we take this earliest date, it's
9    timely.
10           So then we get to the issue of the day, which
11   is does class action tolling apply?  And I will just make
12   one comment that, glaringly, I think the Government's own
13   arguments or the Government's own actions, I should say,
14   belie their arguments here.  Because in late 2021, the
15   Government agreed to stay proceedings in this case,
16   pending the disposition of the Washington Federal appeal,
17   jointly starting to this Court, the Federal Circuit's --
18   this quote, "The Federal Circuit's rulings in Washington
19   Federal may provide binding guidance in this case given
20   the overlapping issues in claims."
21           Well, if this case was so clearly untimely as
22   the Government now wants to say and the contract claims
23   are so far afield of Washington Federal, why did the
24   Government not move to dismiss this case on limitations
25   back in 2021, rather than agreeing to stay this case so

1    we can all address it in 2024?  But --

2                THE COURT:  Well, I wanted to ask you about

3    those statements, too, because that was a joint motion.

4    And so you were arguing that the Washington Federal

5    Plaintiffs allege that FHFA, as conservator, exceeded its

6    authority and that the -- there's a -- just like in

7    Washington Federal, a direct claim that the FHFA's

8    imposition of the conservatorship was not authorized by

9    HERA and does constitute a takings or illegal -- and/or

10   illegal exactions.

11               So now, you're saying, here, that it's unlike

12   other enterprise shareholder cases.  So for purposes --

13   well, I guess for some purposes and not for others.  So

14   I'm trying to figure out what's so different about this

15   case for the sort of preclusion purposes and then, you

16   know, I kind of want to address that same tension that I

17   asked the Government about earlier, where you're trying

18   to say for some purposes, we're just like Washington

19   Federal and we should be tolled, and then for other

20   purposes, we're very different and we shouldn't be

21   precluded.

22               MR. DIAMOND:  Well, I think when we get to the

23   Government's last argument about -- that somehow the

24   implied contract claims should be treated separately and

25   not applied, you get to what is the challenged conduct in

1    both cases, and that's where we say the challenged

2    conduct is one and the same.  The underlying facts are

3    the same.  The conservatorship that was -- that the GSEs

4    were placed into, that happened.  That happened in

5    Washington Federal; it happened here.  That fact is not

6    different.

7             The allegations that we've made in our

8    complaint with respect to the taking and the GSE Tier 1

9    capital, they're also going to be the same.  What's

10   different is this is a completely utterly different set

11   of legal causes of action between what's being alleged

12   here and what's being alleged in Washington Federal.

13            As Mr. Ruyak pointed out with respect to the

14   preclusion arguments, we're not arguing that the taking

15   by the Government here was somehow an illegal taking.

16   That's what we argued in Washington Federal in terms of a

17   legal cause of action.  We actually take the opposition

18   position.  We think the Government had every right to do

19   what it did in placing the GSEs into conservatorship, but

20   it constitutes a taking.  And for that, under the 5th

21   Amendment, we're entitled to just compensation.

22            But for purposes of equitable tolling here, let

23   me go back to that because I think this really starts

24   with the bedrock.  And I know the Court is familiar with

25   obviously American Pipe and Crown Cork, but I think it's

1    worth, if you'll indulge me, to take a couple of minutes,

2    because the teachings from those United States Supreme

3    Court cases are, if not controlling here, certainly

4    extremely persuasive.

5         And I'll start with one proposition at the

6    outset.  The Government asserts no case here, none

7    whatsoever, to you in their briefing or otherwise today

8    in which there is class action tolling involving the

9    Tucker Act.  There's only one case that addresses that,

10   Your Honor, and that's the Bright case.  It's the only

11   case cited by anybody that involves the Tucker Act and

12   involves class action tolling.  And we know what -- the

13   Federal Circuit came out saying that the class action

14   tolling should apply.

15        But hold that thought for one moment because I

16   do want to go back to American Pipe and to Crown Cork for

17   a moment.  American Pipe is the grandfather or the

18   grandmother, if you will, of all the line of cases, the

19   genesis of class action tolling.  And the holding there

20   is that the commencement of a class action suspends the

21   applicable statute of limitations as to all asserted

22   members of the class who would have been parties had the

23   class action proceeded and the class action requirements

24   been met.

25        Mr. Justice Stewart, in that case, went to

1    great lengths to trace the history and the purpose of the

2    class action statute and Rule 23.  At page 551 of that

3    opinion, Mr. Justice Stewart said, "The commencement of

4    the action satisfied the purpose of the limitation

5    provisions as to all those who might subsequently

6    participate in the suit, as well as the named plaintiffs

7    in the class action.

8         "To hold contrary would frustrate the principal

9    function of a class suit because then the sole means by

10   which members of the class could assure their

11   participation in any judgment, if notice of the suit did

12   not reach them until after the running of the limitation

13   period, would be to file earlier individual motions,"

14   precisely the multiplicity of activity that we've been

15   talking about here today under Rule 23 is designed to

16   avoid, having everybody just start filing lawsuits all

17   over the place, clogging the courts, a waste of judicial

18   resources, and not even knowing how any of it's going to

19   come out, which is why you have a class action procedure.

20        But two more very important propositions that

21   came out of American Pipe.  The Court said, "Not until

22   the existence and limits of the class have been

23   established and notice of the membership has been sent

24   does a class member have any duty to take on the filing

25   of any lawsuit or exercise any responsibility with

Michael Kelly, et al. v. USA                              3/11/2024

1    respect to it in order to" --

2              THE COURT:  Is there any question that these

3    Plaintiffs are class members or were putative class

4    members?

5              MR. DIAMOND:  None whatsoever, and I'm glad you

6    raised that.  So if we take a look in Washington Federal,

7    paragraph 209 of the complaint, it says, "Pursuant to

8    Rule 23, with respect to Fannie Mae, Plaintiff, City of

9    Austin Police Retirement System, brings this action on

10   behalf of all persons or entities who held shares of

11   Fannie Mae common stock on or before September 5th,

12   2008."  That's not us.

13             Well, where we come in is the very next,

14   subparagraph 2 on paragraph 209 says, "Plaintiffs,

15   Washington Federal and Michael McCready Baker (phonetic)

16   bring this action on behalf of all persons or entities

17   who held shares of Fannie Mae preferred stock on or

18   before September 5th, 2008."  That is the Plaintiffs in

19   this case, Your Honor.  They were effectively class

20   members.

21             And as Mr. Ruyak alluded to earlier, until that

22   case and a class action proceeded, there was no way, of

23   Mr. Kelly or any of the banks here, of knowing exactly

24   where the juxtaposition would be, how they fit into some

25   kind of -- perhaps a subclass.  And we submit and Mr.

1     Ruyak said -- suggested earlier that -- and this is a

2     little bit of forecasting admittedly, had that class

3     action proceeded forward, I think it's overwhelmingly

4     likely that the banks here, our clients, who held the

5     Tier 1 GSE stock, probably would have been a subclass of

6     those classes of shareholders that held preferred stock

7     that I just mentioned to you that were part of that

8     Washington Federal suit.

9            But there was no way to know that, obviously,

10    unless and until the class action proceeded and then

11    ultimately there would be determinations as to what

12    subclasses should be appropriate and the Court would have

13    made those determinations.  But to your point, there's no

14    question that the Plaintiffs here were members of that

15    Washington Federal class action.

16           Let me just -- let me jump to Crown Cork for a

17    moment and Mr. Justice Blackman speaking for the Court

18    there said, "The commencement of a class action suspends

19    the applicable limitations as to all asserted members of

20    the class who would have been parties to the suit had the

21    suit been permitted to continue as a class action."

22           And, importantly, once the statute of

23    limitations is tolled, it remains tolled for all members

24    of the putative class until that class action ceases or

25    certification is denied.  At that point, Justice Blackman

1    said, "Class members may choose to file their own suits."
2    Only at that point.  "Class members who do not file suit
3    while the class action is pending cannot be accused of
4    sleeping on their rights."  That's the whole purpose of
5    Rule 23.  It permits and encourages class members to rely
6    on the named class plaintiffs to press their claims.
7    And, again, tolling the statute of limitations creates no
8    potential unfair surprise.
9              Now, those are the two United States Supreme
10   Court opinions that I think are the guiding principles
11   here on class action tolling.  They're the only ones
12   really.  Now, admittedly, neither of those cases involved
13   the Tucker Act and Section 2501.  So let me come to the
14   Bright case because it is the only case, as I had
15   mentioned, that addresses class action tolling and the
16   Tucker Act.
17             The Government likes to say -- take the
18   position that all these claims, nevertheless, should be
19   denied tolling because somehow the class action tolling
20   is a form of equitable tolling.  It's equitable in
21   nature.  The American Pipe and the Cork case are all
22   cases that are equitable in nature and the Tucker Act is
23   jurisdictional and it's different.  Well, first off, that
24   was completely rejected by the Federal Circuit in Bright,
25   that proposition.

1          THE COURT:  But how much was that affected by

2     the Supreme Court CALPERS decision later?

3          MR. DIAMOND:  So let me jump to that, Your

4     Honor, because every single case that the Government

5     cites, led by the CALPERS case, is completely utterly

6     inapposite and it is for the following reason.  CALPERS

7     is really simple.  It's a -- it was a securities case,

8     not a Tucker Act case, in which it involved statute of

9     repose.  And the United States Supreme Court, explicitly

10    in that case, went through all of the analyses to show

11    why tolling should not be applicable there because it is,

12    in fact, a statute of repose.

13          And let me -- let me just grab a note here on

14    that.  So if one looks at every single argument that was

15    advanced by the petitioners in the CALPERS case, there's

16    basically four and the Supreme Court rejected all four on

17    essentially the same identical ground.  This is the

18    statute of repose.  But it's important to dissect that a

19    bit.

20          The first holding in CALPERS, American Pipe was

21    inapplicable because that was a statute of limitations

22    subject to equitable and class action tolling and the

23    statute here was the statute of repose.

24          Second argument, permitting a class action to

25    splinter into individual suits, the application of

1    American Pipe tolling here would threaten to alter and

2    expand a defendant's accountability contradicting the

3    substance of a statute of repose.  These are all quotes

4    from CALPERS.

5           The third quote from CALPERS, "The privilege of

6    a class member to opt out is not given without regard to

7    mandatory time limits set by a statute of repose."

8           Four, While the petitioner argues that

9    declining to apply American Pipe to toll the statutes of

10   repose will create inefficiencies, this Court simply

11   "lacks the authority to rewrite the statute of repose or

12   ignore its plain import."  And I would just say, in

13   short, that statutes of repose, Your Honor, are

14   transformatively different animals than statutes of

15   limitation.  No court has the authority -- no court has

16   the authority to change -- not the United States Supreme

17   Court or anyone else -- to change or toll time periods

18   set out by Congress in statutes of repose.

19          And, you know, there's -- it's so logically

20   simple.  I mean, take -- where do you see statutes of

21   repose?  In CALPERS, you saw it in some of the securities

22   laws.  Most every state in the country has a statute of

23   repose, for example, with respect to construction cases

24   and construction defects.  Why do they do that?  They

25   say, well, look, if you're going to build a building,

1    you're going to build a bridge, you're going to build

2    whatever it is and it's -- it may last not 10 years, not

3    20 years, not 50 years, maybe it's 100 years, and then it

4    collapses, it breaks, something happens and you say,

5    well, who are the original architects and the engineers

6    that built that darn thing 100 years ago.

7            Congress just -- the state statutes and

8    Congress says, wait a minute, there has to be some limit

9    on going after people that were engineering,

10   architecting, constructing buildings 100 years ago, and

11   they artificially said it's ten years.  You can look at

12   every statute in the country and I think you'll find that

13   there's ten years statutes of repose.  You can't change

14   them.  So if the building does collapse in year 11 or

15   year 50, you're out of luck going after those people.

16   But that's the difference between statute of repose and

17   statute of limitations.

18           THE COURT:  Well, I mean, I understand that the

19   terms are different, but I guess for -- I mean, the words

20   are different.

21           MR. DIAMOND:  Yes.

22           THE COURT:  But for the Tucker Act, in

23   particular, it's also jurisdictional under Supreme Court

24   precedent.

25           MR. DIAMOND:  It's absolutely not a statute of

1   repose.  I don't think anybody in this courtroom is going
2   to argue to you --
3           THE COURT:  Well, nobody --
4           MR. DIAMOND:  -- that the Tucker Act is a
5   statute of repose.
6           THE COURT:  Right.  Nobody's going to call it a
7   statute of repose, but it's a statute of limitations with
8   characteristics that are similar in that the -- Congress,
9   in waiving sovereign immunity, was pretty, you know,
10  clear that there's a six-year statute of limitations.
11          MR. DIAMOND:  But it's still a statute of
12  limitations.  The Federal Circuit in Bright clearly
13  spelled out that it is a statute of limitations and that
14  it is subject to class action tolling.  The difference
15  between the cases -- what the Government wants to argue
16  is that somehow all of this is equitable in nature, and
17  if it's just equitable in nature, that's not enough.  But
18  that is not the teachings of American Pipe, of Crown
19  Cork, of Bright.  In all of those cases, they are
20  distinguishing tolling a statute of limitations because
21  of equities and saying it's being tolled because we have
22  a statutory basis and purpose for tolling.
23          Now, admittedly, there's some equitable
24  considerations in Rule 23.  The whole concept is to avoid
25  a multiplicity of litigation for the courts and clog

Michael Kelly, et al. v. USA                                    3/11/2024

1    them.  That's an equitable concept.  But the statute is

2    -- it's a statute.

3           Unlike in American Pipe, you weren't talking

4    about there a -- you know, a class action statute.  And

5    so 2501 -- but there's no precedent of any kind, Your

6    Honor, that says that 2501 operates like a statute of

7    repose and that it can't be subject to class action

8    tolling and the contrary is Bright -- is the Bright case,

9    where they said, no, it absolutely is a statute of

10   limitations, and for those people that wanted to opt in

11   after the period of limitations otherwise ran, they were

12   allowed to do so because the class action was tolled.

13          I really think it's that simple.  We have a

14   weight of authority here from the United States Supreme

15   Court, as well as the Federal Circuit, that says class

16   action tolling works to suspend tolling in these

17   circumstances and including the Tucker Act.  There is

18   nothing to the contrary, not a single case.  It's not

19   just CALPERS.  Every single case the Government cites is

20   either a true statute of repose in which the Court has

21   said we're not messing with it, or, for example, in the

22   Big Oak Farms case that the Government relies upon,

23   that's a case in which the plaintiffs -- and that came

24   here out of the Court of Federal Claims.  It's not an

25   appellate decision.  But it was totally logical.

1          What the plaintiffs did in Big Oak Farms is
2     they had a choice.  They initially filed for class action
3     status and then before they proceeded forward with it,
4     they made a decision that they were abandoning class
5     action status completely and instead, once they abandoned
6     the class -- pursuit of the class action, they filed a
7     motion to amend their complaint and the Court said, well,
8     wait a minute, if you're going to do that, then now I
9     need to look and see whether your amended complaint
10    relates back to the original complaint so that you can
11    get past the statute of limitations and found that it
12    didn't relate back.
13         But the point is Big Oak Farms doesn't stand
14    for anything in terms of relevance to this case here.
15    That was a case in which the plaintiffs didn't pursue
16    class action status.  Here, we're talking about our
17    clients relying upon the class action pursuit in
18    Washington Federal and obtaining the benefit of that
19    class action tolling until decision -- now, obviously,
20    you know, the Government says, oh, well, class action
21    certification wasn't actually ultimately sought in
22    Washington Federal.  Well, that's -- at least a motion to
23    certify the class, I should say.
24         It's true.  And I think the Court pointed out
25    earlier this morning it's because they never got there.

1    I mean, the case was dismissed on standing grounds and on

2    the merits.  It had nothing to do with the plaintiffs

3    pursuing class action certification status.

4            And to something that you said earlier this

5    morning, Your Honor.  Talking about whether, wouldn't

6    that be a little bit bizarre, out of order?  Absolutely.

7    For the plaintiffs in Washington Federal to file a motion

8    to certify the class and trying to determine who fits

9    into what class and what subclasses you have, how could

10   you do that before the Court made its decision on the

11   merits on standing?  I mean, the Court would never even

12   have entertained a motion to certify the class.  It was

13   just not ripe.

14           But what's clear is that class action status

15   was sought in Washington Federal from the beginning and

16   no doubt would have been through the end had they not

17   been dismissed on other grounds.

18           THE COURT:  Can I ask a question?  It's one

19   that I asked the Government, as well.

20           MR. DIAMOND:  Sure.

21           THE COURT:  Or two questions.  One is the --

22   whether there's a distinction between Plaintiffs who

23   might want to join the original suit and those who want

24   to join a separate suit.  The Supreme Court in Crown Cork

25   & Seal said there's no distinction, but that wasn't about

1    Section 2501.  So I'm just wondering if you think that

2    Section 2501 makes any difference in that analysis.

3            MR. DIAMOND:  I don't think so at all, Your

4    Honor.  I think Justice Powell's concurring opinion in

5    Crown Cork set it out that if you have -- the purpose of

6    the class action tolling is to avoid the multiplicity of

7    suits and to the extent you're going to have a separate

8    suit brought later at whatever appropriate time, once

9    they're either -- the class action issues have been

10   resolved, those parties to the separate suit get the full

11   benefit of that tolling period.  And I don't think 2501

12   has anything to do with that whatsoever.

13           THE COURT:  And then on the opt-in versus opt-

14   out classes, if that distinction were -- for the CALPERS

15   decision, I wanted to see what you think about the

16   Government's argument that the -- in the Big Oak case

17   that there is a distinction between opt-in and opt-out

18   classes for purposes of meeting class certification as a

19   prerequisite for tolling.

20           MR. DIAMOND:  Well, I do -- one thing I do

21   agree with my learned counsel over there when we are

22   talking about opt-in/opt-out, I mean, you are going to

23   have in the District Courts -- those are all going to be

24   opt-out cases and, of course, here in the Court of

25   Claims, they're going to be opt-in cases.  I'm not sure

1   that that distinction between opt-out and opt-in impacts

2   the efficacy of whether class action tolling is

3   applicable.  I think it could be applicable in either

4   circumstance if you meet the test.

5         THE COURT:  Okay.  And you cited -- also in

6   your brief, you cited the Birdbear case which doesn't

7   mention the CALPERS decision.  I'm wondering what you

8   think of that omission and if it helps or hurts your

9   argument.

10        MR. DIAMOND:  I'm sorry, Your Honor, which case

11   were you referring to?

12        THE COURT:  It's Birdbear.  Let me see if I can

13   find the citation.

14        MR. DIAMOND:  Excuse me one second, Your Honor.

15        THE COURT:  Of course.

16        (Pause in the proceedings.)

17        MR. DIAMOND:  I'm just trying to refresh my

18   recollection, Your Honor, on that particular case.  I

19   think that just stands for the proposition that it

20   supports the long line of authority starting with

21   American Pipe and it's just further, you know, citation

22   along those lines as to why class action certification

23   should apply.  It's not a Tucker Act case.

24        In conclusion, Your Honor, I'd like to wrap up

25   by saying that -- well, I guess the one last issue we

1    really haven't addressed is the Government's position

2    that the implied contract claim should be denied tolling.

3    If I may, let me just take a couple of minutes to address

4    that.

5           The Government posits that not only does there

6    need to be claim identity as between the original class

7    action and the subsequent individual one, but that each

8    and every factual and legal predicate -- I believe that's

9    the language they use in their briefing -- must be

10   identical.  And I submit respectfully, Your Honor, that

11   that is simply not the law.

12          The issue fundamentally is one of notice to the

13   Defendant.  Did the class action allegations put the

14   Government on notice as to the nature of the facts and

15   the claims that the Kelly Plaintiffs here in this suit

16   would be bringing.  And as the Court's familiar, in that

17   specially concurring opinion in Crown Cork, Justice

18   Powell set out when a plaintiff invokes American Pipe in

19   support of a separate lawsuit, just as the Kelly

20   Plaintiffs did here, the Court should take care to ensure

21   that the suit raises claims that concern the same

22   evidence, same memories, same witnesses, as the subject

23   matter of the original class suit so the defendant is not

24   prejudice.  So it's a question of notice.

25          And the overwhelming majority of U.S. Circuit

Michael Kelly, et al. v. USA                    3/11/2024

1      Courts have since followed Judge Powell's reasoning over

2      and over again, finding that subsequent individual claims

3      need not be identical for tolling to apply, so long as

4      they share a common factual basis and a legal nexus so

5      that the defendant would rely on the same evidence and

6      the same witnesses for its defense.

7             As an example, the 3rd Circuit in the Community

8      Bank of Northern Virginia case put it this way. "We find

9      no persuasive authority for a rule which would require

10     that the individual suit" -- our suit here -- "must be

11     identical in every respect to the class suit in order for

12     the statute to be tolled."

13            And there's a 2nd Circuit case that I think is

14     particularly persuasive here, as well.  It's called

15     Cullen vs. Margiotta.  And the 2nd Circuit went to great

16     lengths -- by the way, it's not a Tucker Act case, but it

17     is a class action tolling case and it involved a RICO

18     action in the Federal Courts and a State Court action.

19     And they talk about the concept of what is the challenged

20     conduct.

21            The 2nd Circuit said, "The challenged conduct

22     is what is common to both the RICO and the state law

23     claims and that is what the defendant must be alerted to

24     in order to preserve its evidence, record its

25     recollections, and keep track of its witnesses."  The

1    Circuit went on to say, "We would be hard-pressed to

2    conclude that the complaint was not sufficient to alert

3    the defendant sued there to preserve the evidence

4    regarding the conduct.  Indeed, limiting American Pipe

5    tolling to the identical causes of action asserted in the

6    initial class action would encourage and require absent

7    class members to file protective motions to intervene and

8    assert their 'new legal theories' prior to class

9    certification, thereby producing the very results that

10   the New York Courts seek to prevent by tolling, court

11   congestion, wasted paperwork, and expense."  This is

12   exactly what Justice Powell was talking about in his

13   concurring opinion.

14           The challenged conduct, Your Honor, in

15   Washington Federal here, okay, is indeed the same as it

16   is in this case here.  The imposition of the

17   conservatorship, the actions by the regulators to

18   eviscerate the Tier 1 GSE capital treatment.  And I will

19   say that, you know, I think the Government all but

20   concedes in its briefing that the facts in Washington

21   Federal are the same as those alleged in this case.

22           In its reply brief on page 14, the Government

23   states the claims here are based on the same

24   transactional facts as Washington Federal.  Then it goes

25   -- the Government goes on to say, it could scarcely be

1    plainer that the takings claim, in our amended complaint

2    here, are based on the same transactional facts as the

3    takings claims in Washington Federal.

4           And I heard counsel this morning say, well, but

5    maybe the implied contract claims are different, but,

6    fundamentally, the underlying transactional facts in both

7    Washington Federal and in this case are the same.  What's

8    different is that we have completely -- as the 2nd

9    Circuit alluded to, completely different legal causes of

10   action, which was the case in the Margiotta case in the

11   2nd Circuit where they said you can't make the plaintiffs

12   in this subsequent lawsuit, who would otherwise have

13   gotten the benefit of class action tolling, put forth

14   necessarily all their new legal causes of action and

15   bring that to clog the courts.  They got the benefit of

16   class action tolling in Margiotta because the same

17   transactional facts were present.  And that's what we

18   have here.

19          And so I would just conclude, Your Honor, by

20   saying that the overwhelming weight of legal authority

21   from the U.S. Supreme Court to this Circuit here dictates

22   that the class action tolling apply here.  And if it

23   does, the filing of this complaint was absolutely timely.

24          THE COURT:  Okay.

25          MR. DIAMOND:  Thank you, Your Honor.

1            THE COURT:  Thank you, Mr. Diamond.

2            So I'd like to hear rebuttal from the

3    Government, but before we do, I wanted to just take like

4    a five-minute break, if that's okay with everybody.  So

5    we'll come back -- I have 11:36, so we'll come back at

6    11:41.

7            (Court in recess at 11:36 a.m.)

8                                        (11:42 a.m.)

9            THE CLERK:  Please all rise.

10           THE COURT:  You can be seated.

11           We can hear from Mr. Schiavetti again.  Thank

12   you.

13           MR. SCHIAVETTI:  Thank you, Your Honor.  A few

14   points that I'd like to make.  To start with the statute

15   of limitations issue, opposing counsel mentioned a few

16   times that the challenged conduct is the same.  That's

17   their allegation here.  The problem for Plaintiffs is

18   that, while that may be true for the takings allegations

19   and possibly even for the breach aspect of the contract

20   claims, it is not true for the formation of the contract,

21   which is a critical aspect of those contract claims.

22           And so as we have stated in our briefing and

23   today, many courts require claim identity to apply class

24   action tolling and, certainly, if claim identity is

25   required, then Plaintiffs do not have claim identity

1    because there were no contract claims in Washington

2    Federal.  But even if claim identity were not required --

3    and Plaintiffs misrepresented our position saying that we

4    said they have to have identical factual and legal

5    allegations between the two.  That's not what we said at

6    all in our briefing or today.

7            What we've said is we've used the standard that

8    Plaintiffs have relied on from Justice Powell's

9    concurring opinion in Crown Cork & Seal, which says

10   common factual basis and legal nexus so the Defendant

11   will rely on the same evidence and witnesses.

12   Plaintiffs, in their slides today, have talked about

13   these are the allegations that we've made.  The OCC

14   examiners told us this and that.  The FDIC made these

15   representations.  Those witnesses wouldn't have been

16   involved at all in the Washington Federal claims because

17   there were not claims of the formation of an implied

18   contract between the United States and a bank that was

19   being regulated, bank regulators.  Those were part of the

20   allegations there.

21           So different witnesses, those aspects, those

22   claims are different.  They don't have a common factual

23   basis, legal nexus.  They wouldn't rely on the same

24   witnesses.  Contract claims could not benefit from the

25   class action tolling under either standard, claim

Michael Kelly, et al. v. USA                                    3/11/2024

1    identity or the ones the Plaintiffs rely on from Justice

2    Powell's decision in Crown Cork & Seal.

3             Additionally, on the statute of limitations,

4    Mr. Diamond mentioned that -- he's talking about the

5    commonality between their takings claims and Washington

6    Federal and highlights, again, for the Court, leading

7    into the other aspects I want to talk about, that they

8    held the same asset as the Washington Federal plaintiffs,

9    the preferred shares in Fannie Mae and Freddie Mac.  What

10   they didn't say is we held Tier 1 capital, some other

11   different thing, because it's not a different thing.

12   What they held was enterprise preferred shares, the same

13   asset that was held by the plaintiffs in Washington

14   Federal, notably including Washington Federal who was a

15   bank, same as the Plaintiffs here.

16            There were different plaintiffs that were not

17   banks, but that's -- but the commonality among all of

18   them and the class allegations that were contained in the

19   complaint had to do with the ownership of preferred

20   shares in the GSEs and that's what the Plaintiffs owned

21   here.

22            Turning to the other issues in this case,

23   Plaintiffs continue again to talk about Tier 1 capital as

24   if it's some distinct asset class, something different.

25   The asset that the Plaintiffs held here was enterprise

1    shares.  That's what they acknowledged in a briefing,

2    today, and it's clear from the amended complaint.  This

3    is the same as the asset that was held by the Plaintiffs

4    in Washington Federal.

5            There was no -- they talked about

6    consideration, as well, as if they gave nearly $900

7    million to the Government.  That's not the case.  They

8    purchased preferred shared from Fannie Mae and Freddie

9    Mac, private corporations, that, at that time, when they

10   were purchased, were not in conservatorship.  They were

11   not part of the United States Government in any way,

12   under any conception.

13           Now, the other thing that the Plaintiffs have

14   continued to say is that the Government did take their

15   shares.  They say, you know, we're getting it wrong, the

16   Government took our shares.  The critical aspect to be

17   aware of there is that they're saying this -- in the

18   bankruptcy when the banks were placed into receivership,

19   those assets were liquidated in the receivership.  But

20   the Court -- the Federal Circuit could not have been more

21   clear in Branch and California Housing and Golden Pacific

22   Bancorp and in other cases that placing a bank into

23   receivership cannot be the basis for a takings claim.

24           So they're trying to link two things here in a

25   consequential manner that just cannot be linked.  The

1    triggering event, the government action that they rely

2    on, is the decision to place the enterprises into

3    conservatorship.  That caused the value of the asset that

4    they held, the preferred shares in the GSEs, to decline

5    in value.  That put them below the Tier 1 capital

6    requirement that makes them a solvent bank and that led

7    to a receivership for the banks, a bankruptcy, that

8    cannot itself constitute a taking.

9           This was the same problem in Branch.  The

10   Federal Circuit said the plaintiffs have failed to

11   identify what it was that led to the bankruptcy that

12   constituted a taking.  Plaintiffs here have identified

13   the placing of the enterprises into conservatorships, but

14   that was the same exact claim that the Federal Circuit

15   has already rejected in Washington Federal.

16          Plaintiffs relied on Ideker Farms.  This is a

17   totally inapposite case.  It has to do with the flooding

18   of land.  And what the Federal Circuit found there was

19   that not only was the flooding of land a taking, but if

20   the crops sitting on the land, the personal property, is

21   also physically destroyed by the same flooding, that's

22   also a taking.  It's not consequential.  That's not the

23   case here.  The bankruptcy was, indeed, a consequence of

24   the declination in value of the GSE preferred shares that

25   were held as the asset here.

1          On our preclusion -- on the preclusion issue,
2    opposing counsel has acknowledged that their claims --
3    their takings claims arise from the same transactional
4    facts.  Again, they're trying to muddy -- our briefing I
5    believe is clear, but to the extent that it isn't, the
6    takings claims undoubtedly arise from the same
7    transactional facts as the takings claims in Washington
8    Federal.  The contract claims, however, do not arise from
9    the same transactional facts.  There are different facts
10   involved in the formation of the alleged contract that
11   were not at issue in Washington Federal.
12          Plaintiffs also have mentioned today that the
13   Washington Federal claim was a statutory claim.  That's
14   not correct.  The Washington Federal claim was a
15   constitutional takings/illegal exaction claim.  It was
16   analyzed by the Federal Circuit as such.  It had some
17   basis -- of course, there's an interaction with HERA, the
18   statute, which is the same as Plaintiffs claim today.
19   The government action they're alleging is placing, under
20   the authority provided by HERA, the GSEs into
21   conservatorships by decision of the FHFA director.
22          I noted down in my notes here Plaintiffs stated
23   today when the Government took the banks, they destroyed
24   the value of the asset which led to bankruptcy, and
25   that's exactly what we've been saying.  When they placed

1    the enterprises into conservatorship, that caused the

2    value of the shares to decline and put them below their

3    Tier 1 capital requirements, leading to the bankruptcy,

4    which is both a consequence -- not only that, but the

5    Federal Circuit law could not be more clear that a

6    bankruptcy itself cannot constitute a taking.

7            Finally, on the question of authority, with the

8    contract questions, the Plaintiffs have stated that

9    there's no question that the individuals that they're

10   talking about had authority to bind the Government to

11   what they're doing.  It's just a very vague statement.

12   What they didn't allege was that any individual who they

13   allege engaged in offer and acceptance with the

14   Plaintiffs, had authority to bind the Government in

15   contract.  It's a different question.  So we've cited

16   Mola Dev Corp, among other cases, D&N Bank, in our

17   briefing, that says -- that stand for the proposition

18   that regulatory action or other policy actions by the

19   Government do not lead to contracts unless that's

20   expressly implicit that the intent by the Government is

21   to enter into a contract.

22           And that's what's absent here, both that offer

23   acceptance, that clear unambiguous intent to enter into a

24   contract, and then on top of that, any allegation that

25   the individuals who are engaging in these communications

1    with Plaintiffs had authority to bind the Government in

2    contract.

3         I'm certainly happy to answer any questions

4    that you have, as well, Your Honor.

5         THE COURT:  Yeah, I have one question from your

6    principal argument earlier, which -- when you were

7    talking about standing to bring derivative claims.  I

8    just wanted to see if you had any thoughts on why the

9    conflict of interest exception isn't applicable here.

10        MR. SCHIAVETTI:  Certainly, Your Honor.  We

11   will note, as we noted in our brief there, that the --

12   Judge Sweeney of this Court did find that the conflict of

13   interest exception was applicable.  The Federal Circuit

14   did not address that issue on the merits.  It found for

15   other grounds that the -- because the plaintiffs didn't

16   have a cognizable property interest that either way --

17   that they wouldn't be able to succeed on that claim, so

18   they didn't actually resolve that issue.

19        But as we explained in our briefing, HERA

20   provides that FHFA's shall, as conservators or by

21   receiver and by operation of law, immediately succeed to

22   all rights, titles, powers, and privileges of the

23   regulated entity and of any stockholder, officer, or

24   director of such regulated entity with respect to the

25   regulated entity and access to the regulated entity.

1    That's the succession clause in HERA.

2            The right to bring a derivative suit on behalf

3    of a corporation in appropriate circumstances is a well

4    established right of corporate shareholders.  We have a

5    citation to that in our brief.  The succession clause,

6    therefore, plainly transfer to the FHFA the shareholders'

7    ability to bring derivative suits.

8            The Court found that the conflict -- the Court

9    of Federal Claims found the conflict of interest

10   exception applies there.  Respectfully, we disagree

11   because the broad unqualified language of the succession

12   clause leaves no room for an implied conflict of interest

13   exception.  It states categorically that FHFA's

14   conservator immediately succeeds to all rights, types of

15   powers and privileges of any stockholder with respect to

16   the enterprise.  Moreover, it includes an express

17   exception under which the enterprises may challenge an

18   agency's appointment as conservator in the District Court

19   within 30 days.

20           Another narrow exception permits shareholder

21   participation in the statutory claims process in the

22   event of the enterprise's liquidation.  So the presence

23   of these express exceptions generally precludes the

24   recognition of an additional implicit exception.  We have

25   a citation for that in our brief, as well, the Jennings

1    vs. Rodriguez in the Supreme Court.

2            That Congress expressly granted shareholders

3    and the enterprises -- shareholders these narrow post-

4    conservatorship rights only underscores that the

5    enterprises and the shareholders do not otherwise retain

6    the right to bring suit on behalf of the enterprises

7    during a conservatorship.

8            Does that answer your question on that, Your

9    Honor?

10            THE COURT:  Yes, thank you.

11            MR. SCHIAVETTI:  Any other questions that you'd

12    like me to address on any of the issues today?

13            THE COURT:  I don't think so.

14            MR. SCHIAVETTI:  Thank you for your time, Your

15    Honor.  I very much appreciate it.  And, again, for these

16    reasons and those explained in our briefing, we

17    respectfully request that the Court grant the motion to

18    dismiss and dismiss the complaint.  Thank you, Your

19    Honor.

20            THE COURT:  Thank you to the parties for your

21    time.

22            MR. RUYAK:  Could I just make a couple comments

23    in response to new things that he raised?

24            THE COURT:  Quick comments, sure.

25            MR. RUYAK:  Yeah, there's two things that just

1    are not true.  The Government cites cases for the
2    proposition that when a bank goes into solvency, it's not
3    a taking.  Those are not this case.  Those are situations
4    where the bank itself caused the insolvency.  Every case
5    the Government cites in a situation in which because the
6    bank mismanages itself, does something like that, the
7    bank goes into solvency.  Obviously, that's not a
8    government taking because the bank took it.
9           Here, what we're saying is that these banks
10   were solvent, they were profitable.  The Government
11   forced them into insolvency by what they did by taking
12   the value out of the kind of asset they created.  That's
13   an entirely different situation that is not covered by
14   those cases.  Those cases really deal with where the bank
15   itself has caused the problem.
16          Here, the Government forced the insolvency
17   directly.  And as to Ideker Farms, it is exactly this
18   case.  The Government flooded the land and the Government
19   said, well, we're not liable for the crops.  That was
20   direct.  It's the consequential -- consequential doesn't
21   mean, oh, it happened later.  That is direct and
22   proximate.  Under the law, consequential means indirect
23   and remote results.  In this case, if I take all the
24   cases, Armstrong -- all these cases where the Government
25   dealt with direct versus consequential, the Courts have

1    always said that you look at the direct and proximate

2    causes of the government taking, those are included as

3    have to be compensable.

4            In this case, the Government took the GSEs,

5    destroyed the value of that stock holding, which was

6    different for the banks and other shareholders.  When

7    that was destroyed, immediate insolvency and immediate

8    taking.  That's a direct and proximate result of the

9    Government's action.

10           Thank you.

11           MR. DIAMOND:  Your Honor, if I can indulge you,

12   can I have 30 seconds?

13           THE COURT:  Yes.

14           MR. DIAMOND:  Thank you.  I'm going to keep to

15   it as close as I can.

16           So very quickly, the Government had mentioned

17   earlier this morning that there was a rash of other

18   lawsuits filed in 2018, and why couldn't Mr. Kelly have

19   filed then, although he would have had to have filed

20   prior to 2014, under the Government's theory, to fall

21   within the six-year Tucker Act statute of limitations.

22           For those lawsuits -- I just want to make clear

23   for the Court, those lawsuits that were filed in 2018,

24   they have absolutely nothing to do with our case.  Those

25   were post-conservatorship lawsuits file by those parties

1    that felt they were harmed after the conservatorship for
2    things that were done by the regulators later.  It had
3    nothing to do with the conservatorship itself.
4          And with respect to -- this is -- the point I
5    want to make right now, I want to mention to the Court
6    that it's not in the briefing, but there's something
7    called the forfeiture rule.  And there's a split of
8    authority in the lower courts.  It hasn't been addressed
9    in the appellate courts yet.  But when Mr. Kelly was
10   having to decide whether to file and when, there is a
11   rule that says if you do file your separate lawsuit while
12   the class action is pending, you may no longer get the
13   benefit of class action tolling once you take that step.
14   And that was something that was considered here by Mr.
15   Kelly in not filing earlier.  Not that his claims weren't
16   timely filed because we submit they were.  But in
17   addressing the Government's position, well, he could have
18   filed so much earlier, I would submit that that's really
19   not the case.
20         And I'll just end with that on the Court asking
21   me a lot of questions about 2501 and statutes of repose
22   that if Section 2501 being jurisdictional is somehow
23   turned into a statute of repose, meaning that it cannot
24   be statutorily class action tolled, it would fly on the
25   face of the Circuit Court's opinion in Bright and it

1   would fly in the face of all the line of cases that deal

2   with the issue on class action tolling.  And I submit

3   that that would be -- that would not be a correct

4   application of the law in 2501.

5           Thank you very much.

6           THE COURT:  Thank you.  Okay.  Thank you.  I'll

7   try and issue a decision as soon as I can on this.  I

8   appreciate everybody's time today and -- does anybody

9   have anything else that we need to deal with before we

10  finish?

11          MR. RUYAK:  Nothing from us, Your Honor.  Thank

12  you very much for your time this morning.  You gave us

13  quite a bit.

14          MR. DIAMOND:  Thank you so much.

15          MR. SCHIAVETTI:  Nothing from the Government,

16  Your Honor.  Thank you.

17          THE COURT:  All right.  Then we can adjourn.

18          (Whereupon, at 12:00 p.m., the hearing was

19  adjourned.)

20

21

22

23

24

25

```
 1                  CERTIFICATE OF TRANSCRIBER

 2

 3          I, Elizabeth M. Farrell, court-approved

 4     transcriber, certify that the foregoing is a correct

 5     transcript from the official electronic sound recording

 6     of the proceedings in the above-titled matter.

 7

 8

 9

10     DATE:  3/28/2024           S/Elizabeth M. Farrell

11                                ELIZABETH M. FARRELL, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```